IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-CR-32 |
| | ) | (PHILLIPS/GUYTON) |
| JEREMY ROBBINS, | ) | |
| DIANE SHANDS ROBBINS, and | ) | |
| VAIRAME TEDESCO, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter comes before the Court upon the Defendants Jeremy Robbins' and Diane Shands Robbins' Joint Motion to Suppress Evidence Obtained from the Search of 1628 Brookview Drive [Doc. 101]; Defendants Jeremy Robbins' and Diane Shands Robbins' Joint Motion to Suppress Evidence Obtained from the Search of 8116 Hulls Mill Road [Doc. 130]; Defendant Jeremy Robbins' Motion to Suppress Evidence Obtained from the Search of Tract 12-A Hamblen County [Doc. 210]; Defendant Jeremy Robbins' Motion to Suppress Statements [Doc. 115]; and Defendant Diane Shands Robbins' Motion to Suppress Statements [Doc. 92]. An evidentiary hearing was held on these motions on March 13, 14, and 15, 2006. Assistant United States Attorney Hugh Ward was present representing the government. Attorneys James A. H. Bell and Richard L. Gaines were present representing Defendant Jeremy Robbins. Attorney Jeffrey Z.

Daniel was present representing Defendant Diane Shands Robbins (hereinafter "Diane Robbins").

Attorneys Jonathan D. Cooper and Joel W. Walter were present representing Defendant Vairame

Tedesco.

At the conclusion of the hearings, the Court invited the parties to submit

supplemental briefs. Counsel for Defendants Jeremy Robbins and Diane Shands Robbins submitted

a post-hearing brief on May 15, 2006. [Doc. 267]. The government filed a response to Defendants'

post-hearing brief on May 18, 2006. [Doc. 268]. Defendants filed a reply [Doc. 269] to the

government's response on May 23, 2006, and the government filed a supplemental response brief

on May 24, 2006 [Doc. 270].


## I.  FACTUAL BACKGROUND

### A.      Search of 1628 Brookview Drive

#### 1.  Testimony of David Joyner

The first witness called by the government was David Joyner ("Joyner"). Joyner has

been a police officer with the City of Pigeon Forge for the past seven years. Prior to that, he was

a state trooper with the State of Texas for almost six years. For approximately the past four years,

Joyner has been assigned to the Fourth Judicial District Drug Task Force ("DTF"), a group that is

comprised of agents from different agencies within the Fourth Judicial District and that primarily

focuses on drug work and violent crime.

In January, 2005, Joyner was contacted by Special Agent Mike Davis of the Drug

Enforcement Administration ("DEA"), who said that he had a confidential source who had relayed

to him some information about a major marijuana distribution network in the Jefferson County area.

2

Joyner arranged a meeting with this confidential source. The confidential source told Joyner "that he knew first-hand from things that he had seen and people that he had talked to" that defendants Jeremy Robbins, Diane Robbins, Steve Shipley, and Doug Adams were involved in a marijuana business where they went out west to pick up marijuana and brought it back to the East Tennessee area to distribute it. The confidential source also told Joyner that Jeremy Robbins hired people to come to the residence he shared with Diane Robbins at 1628 Brookview Drive in order to break the larger bundles of marijuana that he obtained out west into smaller, more manageable amounts. Among those individuals who were hired to "break down" the marijuana were Todd Shrader and Doug Adams.

The confidential source also indicated that he knew a person by the name of Jake Moore, who had actually bought marijuana from Todd Shrader, and the confidential source indicated that he believed that Moore might cooperate and participate in a controlled buy of marijuana from Shrader.

Joyner testified that he corroborated the information provided by the confidential source by "confirm[ing] the address" of the Robbins residence. Specifically, Joyner testified that he and Agent Seals were driving with the confidential source to meet his potential informant, when they drove by the 1628 Brookview Drive address. At that time, the confidential source confirmed that this was the residence belonging to Jeremy and Diane Robbins. Joyner admitted on cross-examination that he did not observe any illegal activity occurring at the Robbins residence at that time and that the residence was not placed under surveillance.

Joyner subsequently met with Moore and told him that he wanted to use Moore to purchase marijuana from Todd Shrader, and that "once we got to a point where we could lay hands

3

on Todd Shrader, we could try to flip him in order to get to the Robbins house, the main source."

Moore indicated that he knew of Jeremy Robbins and knew that Shrader purchased his marijuana

from him. Moore agreed to cooperate, and he was paid $100 for each controlled buy. Joyner had

Moore contact Shrader by telephone and told him that he wanted to purchase an ounce of marijuana.

Shrader agreed to sell it to him. Joyner provided Moore with "buy money" and a monitoring device,

and sent him to Shrader's residence. Moore purchased an ounce of marijuana from Shrader at

Shrader's residence. Moore participated in four more controlled buys from Shrader, which involved

progressively larger amounts, and ultimately resulted in a one-pound buy. After the fifth buy,

Joyner obtained a search warrant for Shrader's residence. Joyner testified that when he went to

obtain the search warrant from Judge Hooper, he was put under oath and advised Judge Hooper of

the status of the investigation. Specifically, Joyner testified as follows:

> Q     Did you describe to Judge Hooper what the status of your –
> what your investigation was?
>
> A     Yes.
>
> Q     Did you tell him who your targets were?
>
> A     Yes. He was told the whole story behind Mr. Shrader and
> what we were attempting to do, that we were just trying to use – go
> through Mr. Shrader in order to get to the Robbins[es].
>
> Q     Okay. Did you tell Judge Hooper about Jeremy Robbins?
>
> A     Yes.
>
> Q     Okay. And did he grant you the search warrant?
>
> A     Yes, he did.

[Transcript, Doc. 260 at 18]. On cross-examination, Joyner testified that he made Judge Hooper

aware that the buys had been made with Shrader, and he advised Judge Hooper that they had

4

information from the confidential source that indicated "that Shrader was receiving his marijuana from Mr. Robbins at his residence." Joyner also advised Judge Hooper that the confidential source indicated that Steve Shipley, Diane Robbins, and Doug Adams were involved as well.

Joyner testified that Shrader originally was expecting Moore to come to Shrader's residence for the buy, but Joyner had Moore call Shrader and ask him to deliver the marijuana at Moore's residence instead so that the DTF could control the buy and "try to keep it under wraps." On March 2, 2005, Shrader arrived at Moore's residence, and DTF officers approached him and advised him that they had a search warrant for his residence and that they knew that he was there to deliver marijuana. Joyner testified that he did not have his weapon drawn, but that he could not remember if other officers had their weapons drawn. Shrader was read his Miranda rights, and the officers asked him to cooperate in their investigation of Robbins. Shrader admitted that the marijuana that he had was fronted to him by Jeremy Robbins and that he owed Robbins $6,900. However, he was not willing to commit to cooperating with the DTF at this time. The officers left Moore's residence and went to Shrader's residence along with Shrader to execute the search warrant. During the course of the search, Shrader told Joyner that he would normally only get a pound of marijuana at a time from Jeremy Robbins. Shrader also told Joyner that he had been getting marijuana from Jeremy Robbins for a six to eight-month period and that he got the marijuana from Robbins at the 1628 Brookview Drive address, the residence of Jeremy and Diane Robbins. Approximately one and one-half pounds of marijuana were recovered during the search of Shrader's residence, as well as marked currency from the previous day's buy. After photographing and tagging the evidence, Joyner asked Shrader to consider cooperating with the DTF and asked him to call him the next day.

5

On March 3, 2005, Shrader's attorney contacted Joyner. Joyner told the attorney that the DTF wanted Shrader to go to the Robbins house and "settle up on the drug debt that he owed and then perhaps attempt to purchase or have another pound of marijuana fronted to him." Joyner was later contacted by Shrader, and they met on March 3, 2005 at the DTF's office in Sevierville. At that time, Shrader tried to place a call to Jeremy Robbins but was unable to reach him. Robbins, however, returned Shrader's phone call, at which point Shrader told him that he had his money and would deliver it to his house. [Cell phone records, Ex. 11]. Joyner gave Shrader marked funds and assembled a group of officers, including Agent Neal Seals, Agent Jerry Spoon, Officer Wayne Knight, and Agent John Morgan. A listening device was placed on Shrader. The device was only for the purpose of monitoring conversations; it did not record.

At approximately 10:30 p.m. on March 3, 2005, the agents followed Shrader to the Robbins residence and took up a position about 300 or 400 yards away. Shrader went to the residence, and Diane Robbins answered the door. Jeremy Robbins was not present at the time. Diane Robbins let Shrader in the house. Through the listening device, the officers heard Shrader say, "here's the money that I owe," and that Diane Robbins told him to set it on the kitchen counter. Shrader asked Diane Robbins about possibly getting some more marijuana, and she indicated that he needed to talk to Jeremy about that. Thereafter, Shrader left the residence. The officers met with Shrader afterward to retrieve the wire. Two agents remained to maintain visual surveillance on the Robbins residence while Agents Joyner, Seals, and Knight went to Judge Hooper's residence in Cocke County. The agents typed the search warrant application and affidavit in the surveillance vehicle on a laptop computer on the way.

6

Joyner prepared an affidavit to accompany the search warrant application, which

states as follows:

1. I am a Special Agent with the State of Tennessee Fourth Judicial District Drug and Violent Crime Task Force. I have been employed by the Pigeon Forge Police Department for approximately 6 years. The past 3 years I have been assigned to the Drug Task Force. Prior to my service with Pigeon Forge, the Texas Department of Safety employed me as a State Trooper for 5 years. During the past 11 years as an officer and Drug Task Force Agent, I have been involved with or participated in approximately 300 narcotic investigations. I have worked in an undercover capacity to purchase narcotics and gain intelligence. I have executed search warrants, conducted surveillance of drug transactions, seized evidence, arrested suspects, interviewed suspects, and have gained considerable experience by conferring with Local, State, and Federal Prosecutors and other Law Enforcement Officials in my community regarding narcotic investigations.

2. On March 2, 2005 Agents from the 4th District Drug Task Force conducted undercover operation at the residence of Jake Moore. Moore resides at 1417 Buckeye Way in Dandridge, Tennessee. Agents had arranged the delivery of five pounds of marijuana through a cooperating individual. Richard T. Shrader[] had unknowingly delivered five pounds of marijuana to undercover Task Force Agents. Agents confiscated 5 pounds of marijuana and $1200.00 of Confidential Task Force marked bills.

3. On March 3, 2005 Agents were given information that the 5 pounds of Marijuana was [sic] advanced to Shrader by Jeremy Daniel Robbins. Robbins resides at 1628 Brookview Drive in Jefferson County Tennessee. Shrader was to deliver $6900.00 in United States currency to Robbins on March 3, 2005.

4. Agents arranged for $6900.00 in U.S. currency to be delivered to Robbin's [sic] residence 1628 Brookview Drive in Jefferson County Tennessee. The $6900.00 in U.S. currency was Drug Task Force funds with recorded serial numbers.
5. Based on above intelligence, surveillance, experience and training, Affiant David L. Joyner believes that illegal narcotics and drug proceeds are in the residence of 1628 Brookview Drive, Jefferson County, Tennessee....

6. I request to search the above mentioned residence, including outbuildings, and vehicles for: narcotics, packaging materials used to package and preserve narcotics, weighing devices used to weigh and distribute narcotics, receipts, records and other documentation which reflect narcotic sales, weapons, which are used as protection devices in the illegal drug trade, illegal drug proceeds and surveillance equipment. All of these items constitute contraband; property used, or intended to be used in commission of a drug offense in violation of the laws of the State of Tennessee.

When the agents arrived at Judge Hooper's residence, it was after midnight. Joyner testified that they "told [Judge Hooper] what had happened. He already knew that [sic] what we planned to do." Joyner reiterated that on March 2, the agents had "made [Judge Hooper] aware of what our plan was and what our ultimate target was, which was the Robbins[es], and that Mr. Shrader was just a stepping-stone towards the Robbins[es]; that we knew that Jake Moore was buying marijuana from Shrader for us and that Shrader was getting his marijuana from the Robbins and that ultimately that's where we wanted to end up." Judge Hooper placed the agents under oath. Joyner testified that they "basically went back over everything, I mean, that we'd already talked about . . . and then what we'd just done at the Robbins residence." Specifically, Joyner testified that he told Judge Hooper that they had sent Shrader into the Robbins residence with marked currency and that Shrader had placed the money on the kitchen counter as instructed by Diane Robbins. Joyner testified that they related to Judge Hooper what they had heard on the monitor about the money being delivered and Shrader requesting marijuana. Joyner also testified that they told Judge Hooper that Jake Moore was the cooperating individual referenced in Joyner's affidavit.

With respect to the reference in paragraph three of Joyner's affidavit that "[a]gents were given information that five pounds of marijuana was [sic] advanced to Shrader by Jeremy Daniel Robbins," Joyner testified that this information came from Shrader and that Judge Hooper

orally was made aware of that fact. Joyner told Judge Hooper that Shrader claimed to have purchased the marijuana from Robbins, but it is unclear to the Court whether Joyner told Judge Hooper that Shrader said that the buys were made at the Robbins residence, 1628 Brookview Drive. Joyner testified that he did tell Judge Hooper that the agents were going to execute the search warrant immediately. Joyner testified that Judge Hooper made a few suggestions to the warrant with regard to punctuation and spelling. Joyner testified that these minor changes were made, and that Judge Hooper signed the warrant at 12:30 a.m.

While the agents were at Judge Hooper's residence obtaining the Robbins search warrant, Joyner told Judge Hooper the information the agents had about Steve Shipley, including where he lived; that they had information that Shipley had made trips out west to pick up marijuana with Jeremy Robbins; and that more than likely his house was used for a stash house. Joyner discussed possibly obtaining a warrant for Shipley's residence based upon this information. Joyner testified that Judge Hooper told him that based on the information that the agents had, they did not have enough to get a search warrant, but he encouraged the agents to do a "knock and talk."

At approximately 3:30 a.m., Joyner assembled a team of agents including himself, Agent Seals, Agent Spoon, Agent Morgan, Officer Knight, Deputy Eric Rhinehart, and K-9 Officer Eric Thomas to execute the search warrant at the Robbins residence. Once they pulled up in the driveway, Officer Knight went to the back of the house, and the rest of the team was "stacked" at the front door. Joyner testified that he had previously received information from the confidential source that Jeremy Robbins was possibly in possession of weapons. Joyner admitted on cross-examination that there were not any lights on in the house and that they did not hear any noise coming from inside the residence.

9

Joyner testified that, "We knocked and announced, beat on the door, said, 'Police, search warrant,'" and that they allowed about a minute (or "close to a minute") to pass before they breached the door with a battering ram. On cross-examination, Joyner conceded that he assumed that Mr. and Ms. Robbins were asleep at the time, stating, "I'm sure they're asleep." Joyner knew that Mr. and Ms. Robbins were in the house, based on surveillance. Agents Joyner, Seals, and Spoon entered the residence, proceeding through the foyer and down a hallway, where they encountered Jeremy Robbins as he was coming out of his bedroom. Joyner testified that Robbins was dressed in sleeping attire. Robbins was taken into custody and placed in the living room. Diane Robbins was found in bed in the master bedroom. She was told to get out of bed, was immediately handcuffed, and was placed in her son's bedroom.

Joyner testified that he read Jeremy Robbins a Miranda rights waiver, let Robbins read it himself, and that Robbins signed it at 3:43 a.m.. [Ex. 2]. The waiver signature is witnessed by Deputy Rhinehart and Joyner. Joyner testified that Robbins did not request a lawyer and that he indicated that he understood his rights. Joyner asked him if he wanted to make a statement, but Robbins declined. Joyner testified that during the search, other than requests for clothing or a drink, Robbins made no other statements, and that no questions were asked of him.

Diane Robbins was advised of her Miranda rights by Agent Seals. She signed a rights waiver, which was witnessed by Agents Seals and Joyner. [Ex. 4]. Joyner testified that Diane Robbins made several statements about Steve Shipley during the search. Diane Robbins stated that Shipley probably would not deny the officers access to his house; that he smokes marijuana; and that he would have marijuana at his house, although she did not indicate an amount. At no time did Diane Robbins indicate that she or Jeremy Robbins had any ownership interest in the house in which

10

Shipley lived. Joyner testified that he knew from the confidential source that the Shipley residence was rented to Shipley by Jeremy Robbins' father.

During the course of the search, the agents discovered marijuana "all over the house," including the bedroom closet, a nightstand, a dresser, the bathroom, the kitchen, the vehicles, and the basement. Joyner testified that there was money "everywhere" – including in Diane Robbins' purse, Jeremy Robbins' pockets, the desk, and the vehicles. Joyner further testified that they found three weapons in the master bedroom, including one that was loaded. The DTF marked funds were also recovered from the Robbins residence. Several photographs of the currency, marijuana and weapons discovered in the home and in the Robbins' vehicles were introduced into evidence at the hearing. [Coll. Ex. 7].

On cross-examination, Joyner testified that he was not aware of any investigation that DEA Special Agent Davis had done of the confidential source. Joyner testified that he did not investigate the reliability or credibility of the confidential source due to the confidential source's "position and his personal knowledge of the two subjects and the fact that he was able to introduce me to Jake Moore."

### 2. Testimony of Neal Seals

Agent Neal Seals also testified on behalf of the government. Agent Seals is a police officer with the City of Sevierville, and he is currently assigned to the DTF. He has been a police officer for over ten years and has served with the DTF for a little over a year.

Seals testified that he was present when the search warrant for Shrader's residence was obtained. He testified that all of the officers were placed under oath, and that they related to Judge Hooper the information that they received from Jake Moore regarding the buys that the DTF

11

had arranged. Seals was also present at the "buy bust" at Jake Moore's residence. He testified that

he and Agent Joyner approached Shrader, advised him of his <u>Miranda</u> rights and told him that they

had a search warrant for his residence. Seals testified that Shrader confirmed that he was getting his

marijuana from Robbins, and that he would go to Robbins' residence to get the marijuana.

Seals was one of the officers who went to obtain the search warrant for the Robbins

residence. He testified that he and the other officers were placed under oath. Seals testified that

they "laid out [their] investigation" to Judge Hooper, and that they advised him that the marked

funds had been delivered to the Robbins residence. Seals further testified that they told Judge

Hooper "about Todd Shrader" and about what they "had observed and listened to." Again, it is

unclear whether Seals told Judge Hooper that Shrader had actually claimed to have purchased

marijuana from Jeremy Robbins at the Robbins residence, 1628 Brookview Drive. After obtaining

the search warrant, Seals testified that they went to serve it at the Robbins residence.

Seals testified that they arrived at the Robbins residence about 3:20 or 3:30 a.m. He

testified that he, Spoon, Morgan, Joyner, and Rhinehart went to the front door of the residence, and

that Officer Knight went to the back of the residence. He testified that they knocked and announced

that they were police officers with a search warrant. He testified that they waited approximately one

minute, and that Agent Morgan used a battering ram to open the door. Seals testified that upon

entering the residence, he went into the dining room-kitchen area and looped back around to the

living room, where he observed that the other officers had taken Jeremy Robbins into custody. He

then assisted Deputy Rhinehart in clearing the basement. When he came back up from the basement,

he noted that the other officers had taken Diane Robbins into custody. Agent Seals testified that he

was familiar with Diane Robbins as they had gone to high school together and had worked together

at Wal-Mart. Seals testified that he read Diane Robbins her <u>Miranda</u> rights, and that she indicated

that she understood those rights. She signed a rights waiver, and Seals and Joyner both signed as

witnesses. Seals noted the time of signature on the form as 3:41 a.m.

Seals testified that after Diane Robbins had signed the waiver, he asked her whether

she knew of any drugs in the house, and that she stated that she had a little bit of marijuana in her

bedroom closet for her personal use. Seals also asked if she knew of Jeremy Robbins ever going out

west. She stated that she knew he had gone out west, but that she did not know what for, and that

she had not been out there with him. Seals also asked her about Steve Shipley. Diane Robbins told

Agent Seals that she and Jeremy Robbins had smoked marijuana at Shipley's house before and that

Shipley "would have a little bit" of marijuana at his house. Seals testified that Diane Robbins never

stated that she or Jeremy Robbins had any possessory interest in Shipley's residence.

Seals testified that Diane Robbins' purse was searched and that $2,500 in cash was

found. Diane Robbins stated that she had obtained that money through her candle-making business.

She told Agent Seals that she made approximately $40,000 the year before with this business.

Later, Seals asked Diane Robbins about the $6,900 in DTF funds that had previously

been delivered by Shrader, as the officers were having difficulty locating these funds. Although she

initially denied it, she eventually admitted that Shrader had come by and had left an envelope on the

kitchen counter. Agent Seals walked into the kitchen and recovered the envelope and handed it to

Officer Morgan.

Seals testified that he did not question Diane Robbins any further. He further stated

that she was not handcuffed at this time, and that she eventually fell asleep. Seals testified that

13

Diane Robbins never requested to speak with an attorney at any time. Seals testified that no other officers questioned Diane Robbins during the search.

### 3.     Testimony of DEA Special Agent Dave Lewis

Dave Lewis is a Special Agent with the DEA. He has been a DEA agent for nearly 20 years. Previously, he was an agent with the Tennessee Bureau of Investigation ("TBI") for over three years.

On March 4, 2005, Agent Lewis received a call from Agent Joyner, who informed him that the DTF had executed search warrants at the residences of Robbins and Shipley. Joyner asked if the DEA would seek federal prosecution of Robbins and Shipley. Agent Lewis contacted the U.S. Attorney's Office and received permission to begin a federal investigation. Agent Lewis arranged for Shipley and Robbins to be brought to the DEA office in Knoxville to be processed prior to being taken to their initial appearance.

Agent Lewis testified that Shipley and Robbins arrived at the DEA office at approximately 1:15 p.m. on March 4, 2005. Robbins was brought into a conference room where Agent Lewis and Agent James Blanton interviewed him. Agent Lewis testified that Agent Davis was in and out of the room as well. Prior to asking Robbins any questions, Agent Lewis testified that he introduced himself and Agent Blanton to Robbins; told Robbins where he was and why he was there; and told him what he was going to be charged with and the possible penalties he would be facing as a result of those charges. Lewis further testified that he told Robbins that he was going to advise him of his rights, and that Robbins stated that he had already been advised of his rights. Lewis testified that at that point, Robbins "blurted out" that the marijuana stored at the Shipley

14

residence was his and that Shipley was only storing it for him. Lewis then advised Robbins of his constitutional rights and had him sign a rights waiver form. This rights waiver form was introduced into evidence [Ex. 3]. The form had been signed by Robbins and witnessed by Agents Blanton and Lewis at 1:52 p.m. Lewis testified that he read the waiver form to Robbins and asked him line-by-line whether he understood his rights. Lewis testified that Robbins indicated that he understood his rights. Lewis testified that Robbins did not indicate at anytime that he wanted to speak with a lawyer. In fact, Lewis testified that Robbins indicated to him from the beginning of the interview that he had a willingness to talk, and that Agent Lewis was intentionally slowing down the proceedings to ensure that Robbins understood what he was doing. Lewis testified that no negotiations occurred during the reading of the rights waiver.

Agent Lewis testified that Pretrial Services was not present when Robbins arrived at the DEA office. He testified that any interview of Robbins by Pretrial Services would have occurred after his interview.

Agent Lewis testified that Robbins began to tell him about his involvement in drug trafficking. When Agent Lewis asked Robbins to identify the people he would sell marijuana to, Robbins said that he was not sure that he wanted to do that and asked for time to think about that for a little while. At this point, Agent Lewis terminated the interview. Agent Lewis testified that he spoke to Robbins for approximately 15 to 20 minutes, and then began to interview Mr. Shipley. After finishing his interview of Shipley, Agent Lewis testified that he transported Robbins to federal court for his initial appearance. Agent Lewis testified that when they got in the vehicle, Robbins volunteered that he had changed his mind and that he was willing to tell Agent Lewis the names of

the people to whom he sold marijuana. Robbins identified five people as his primary customers and gave details about their addresses, phone numbers, and the types of purchases they made.

After his initial appearance, Robbins was appointed a lawyer. The government reached an agreement with Robbins' counsel that Robbins would cooperate under <u>Kastigar</u>. Pursuant to this agreement, Agent Lewis explained, so long as Robbins told the truth, nothing he said from that point on would be used against him. A fuller interview of Robbins was conducted on March 8, 2005 pursuant to this agreement.

### 4. Testimony of Jeremy Robbins

Jeremy Robbins testified that when he was brought to the DEA office on March 4, 2005, he was initially placed in a holding cell for a few hours. He testified that the Pretrial Services Officer, Twilla Tucker ("Tucker"), showed up and took him into a room and began filling out paperwork on him to see if he could have a lawyer appointed. He advised Tucker that he wanted a lawyer but that he could not afford one. Robbins testified that during this interview, Agent Lewis came in and told Tucker that he was going to interview Robbins first and that Tucker could go ahead and take care of Shipley's paperwork. Robbins testified that he went into a conference room with Agent Lewis. He testified that they were alone in the room, except for Agent Davis coming in and out. Robbins testified that Agent Lewis read him his rights and asked him if he understood it after each sentence.

Robbins testified that after they were done reading the rights waiver, and he signed and dated it, he asked Agent Lewis when he would be able to speak to his lawyer. Robbins testified that Agent Lewis stated that Pretrial Services was working on getting his paperwork done and that Robbins would be able to see a lawyer at his initial appearance. Robbins testified that Agent Lewis

16

told him that having a lawyer present "pretty much gets in the way, that a deal, if a deal could be worked, that it would be a lot easier done if it was just me and him." Robbins testified that Agent Lewis told him that he hoped Robbins would cooperate, and that if Robbins agreed to cooperate, the government would offer him <u>Kastigar</u> protection. Robbins testified that Agent Lewis explained that <u>Kastigar</u> protection meant that if Robbins offered to share information with the government, nothing he said could be used against him, and that Robbins would be provided "the full protection" of the government. Robbins testified that Agent Lewis said that if Robbins cooperated, he could receive as much as a 50 percent sentence reduction, although such a reduction was very rare. Robbins testified that Agent Lewis stressed that he himself could not decide on that reduction, but that he could make a recommendation to the U.S. Attorney.

Robbins testified that they waited for Agent Blanton to come in to witness the signing of the rights waiver. Robbins testified that thereafter, he shared information with Agent Lewis, but that he was hesitant, and that he agreed to talk to him only after he was told "repetitively" that his wife could and probably would be indicted if he did not cooperate. Robbins testified that he decided to cooperate because he did not want his wife to be indicted and because Agent Lewis had told him that what he said could not be used against him.

5.    **Testimony of Agent James Blanton**

The government called DEA Special Agent James Blanton in rebuttal to Mr. Robbins' testimony. Agent Blanton has been a DEA agent since 1998. He testified that it is DEA procedure to use a DEA Form 13 to advise individuals of their <u>Miranda</u> rights, and that when such rights are read, it is usually witnessed by another officer to corroborate that it was read correctly and that it was witnessed and signed.

17

Agent Blanton testified that on March 4, 2005, Agent Davis asked him to step in and sit in on an interview with Mr. Robbins. When Blanton arrived, Robbins was in the room along with Agent Lewis. Agent Davis was in the doorway. Blanton walked in, and he and Lewis started the interview. Blanton testified that he was present when the advice of rights was given to Robbins. He testified that Lewis read through each line of the waiver with Robbins and asked him after each line whether he understood his rights, and that Robbins indicated that he did. Blanton denied that any arrangement different from what was stated in the waiver form was ever discussed. Blanton testified that he was present for the entire interview, and that there was not an offer of leniency or of any type of <u>Kastigar</u> agreement. Blanton did not recall anyone from Pretrial Services being at the DEA office during this interview.

### 6. Testimony of Twilla Tucker

The government also called Pretrial Services Officer Twilla Tucker in rebuttal. Tucker has been a pretrial services officer since 1993. She testified that on March 4, 2005, she got a call from DEA saying that they had arrested two people who were at the DEA office and available for a pretrial interview. Tucker testified that, according to her travel records, she left her office at 1:30 p.m. and probably arrived at DEA between 1:45 and 1:50 p.m. Tucker testified that she interviewed Steve Shipley at approximately 2:30 p.m. and Jeremy Robbins at approximately 3:00. Tucker testified that Agent Lewis brought Mr. Robbins to her for the interview. She denied that Agent Lewis ever interrupted her interview with Robbins. She returned to her office at 3:40 p.m. She recalled that before their interview began, Jeremy Robbins stated to her that he really liked Agent Lewis, that he was a "nice guy," that Agent Lewis was treating him right, and that he was "very happy with him."

### B.    Search of 8116 Hulls Mill Road

Joyner also testified regarding the search of 8116 Hulls Mill Road.  Following the execution of the search warrant at the Robbins' residence, Joyner, Knight, Spoon, and Thomas went to Shipley's residence located at 8116 Hulls Mill Road in Talbott, Tennessee, for a "knock and talk."  They arrived at approximately 7:00 a.m. and knocked on the door.  When Shipley answered, the officers identified themselves and told him that they had just executed a search warrant at the Robbins residence.  Joyner asked if they could come inside and talk to him.  Joyner testified on cross-examination that he could not recall if he was armed during this exchange, but they knew that the other officers present were carrying weapons.  Shipley stated that he needed to put his dogs up, as they were running freely in the house.  Joyner testified that he could see everything that Shipley was doing from the front door.  Shipley secured the dogs and invited the officers in.  Joyner told Shipley that Diane Robbins had said that he had marijuana in his house.  Shipley asked him if he wanted him to retrieve the marijuana.  Joyner told him that "if he wanted to, that was fine."  Shipley retrieved two marijuana buds in a plastic bag.  Joyner advised him that they had been told that Shipley had more than just two marijuana buds.  Joyner testified that at that point, Shipley "just turned around and walked to the rear of the house."  Joyner testified that he followed Shipley for officer safety, not knowing if he had weapons.  Joyner testified Shipley took him to a small room off the kitchen that contained a floor safe.  There were large bundles stacked in the room but Joyner could not identify their contents.  Shipley proceeded without instruction to open the safe, where Joyner could see a gallon-size freezer bag with marijuana in it, as well as some currency.  Joyner told Shipley to stop and return to the living room to talk.  Joyner read Shipley his <u>Miranda</u> rights and

19

gave him an opportunity to read those rights himself. Shipley signed a rights waiver at 7:37 a.m. [Ex. 6]. The waiver was witnessed by Joyner and Spoon.

Shipley was also presented with a consent to search. Joyner explained this document to him, and Shipley signed it. [Ex. 5]. The officers then conducted a search of Shipley's residence. They discovered approximately 600 pounds of marijuana, as well as approximately $92,000 in cash. They also found some grow equipment in the residence. Photographs were taken of these items and introduced into evidence at the hearing. [Coll. Ex. 8]. During the search, Shipley stated that the money belonged to him. Shipley did not state at any time before and during the search that Jeremy Robbins had any ownership interest in the house. Joyner testified that the officers did not find any personal items related to Jeremy Robbins in Shipley's residence during the search.

C.      **Search of Tract 12-A, Hamblen County, Tennessee**

Agent Joyner testified that on April 19, 2005, he and Agents Seals, Lewis, and Davis went to the residence of Doug Adams and Sheila Adams to execute an arrest warrant for Doug Adams. Joyner testified that when they arrived, Doug and Sheila Adams were present, as was Doug Adams' uncle, Ron Adams. Joyner testified that he spoke with Ron Adams briefly, and that within 10 to 15 minutes, Ron Adams asked to leave. Ron Adams consented to his vehicle being searched, and after it was searched, the officers told him that he could go.

Joyner testified that there was a chain link fence that encircled Doug Adams' property and that there was a barn sitting right next to the fence. Joyner also recalled that there was a gate on the side of the barn that led to an exterior door of Doug Adams' garage. Doug Adams told the agents that he had access to the barn, but that he did not use it. He also told the agents that his uncle

Ron Adams owned the barn. Doug Adams never mentioned to the officers that Jeremy Robbins had any ownership interest in the barn.

Doug Adams provided the agents with his uncle's cell phone number. Joyner made the initial call to Ron Adams, who was on his way back to Georgia at the time. Specifically, Joyner told Ron Adams that they had information that the barn was or had been possibly used as a stash house for marijuana by Jeremy Robbins, and he requested consent to search the barn. Joyner testified that Ron Adams asked a few "general questions" and gave the agents permission to search the barn for contraband. Joyner denied that Ron Adams ever asked to speak to Doug or Sheila Adams before consenting, or that he ever revoked his consent.

Once the officers obtained consent from Ron Adams, they obtained a key to the exterior door from Doug Adams, and began to conduct a search of the building. Joyner testified that they discovered some new construction in the barn where a wall had been built separating the bottom floor into two separate compartments. The second compartment, which was not visible from the front door, was divided into two rooms. Joyner testified that once the agents passed through the first door where the new wall had been built, they observed a wall that was framed with a thin piece of paneling. The other room of the second compartment had exposed cinder block walls. Based upon this difference in materials, the agents believed that the paneled wall was a false wall. They peeled back a little bit of the paneling and shined a light inside. Joyner testified that they saw what they believed to be a safe. Agent Lewis contacted Ron Adams a second time to confirm his consent for the search. During the course of their search of the barn, the agents discovered two safes behind the wall and marijuana residue in the bottom of a shop vac. Joyner testified that he believed the

room next to the area where the safes were found had been used as a "breakdown room" but had been thoroughly cleaned.

During the evidentiary hearing, the government introduced a Lease with Purchase Option entered into on September 22, 2004 between Jeremy Robbins and Ron Adams for the lease of Tract 12-A. [Ex. 15]. Joyner stated that Ron Adams never told him that Jeremy Robbins was leasing the barn.

Agent Seals was also present at the Adams residence on April 19, 2005 and participated in the search of the barn. Agent Seals testified that they did a search of the barn and that it had "been cleaned up real well." He stated that they discovered some marijuana residue in a shop vac. Agent Seals testified that when he saw the wood paneling wall in the barn, he thought that it "didn't look right" to have a wooden wall next to a concrete wall. Agent Seals testified that Agent Joyner pulled back a piece of plywood and saw safes behind the wall. The agents then conducted a fuller search and discovered two large safes. The safes were locked, and a locksmith was called. The safes were empty.

Agent Lewis testified that when they arrived at the Adams residence, he approached Doug Adams and advised him that he had a warrant for his arrest. Lewis testified that he told Doug Adams that he did not want to execute the arrest warrant and that he would rather have Doug Adams' cooperation. Lewis requested consent to search the residence, and Doug Adams refused. Lewis again asked him if he would be willing to cooperate, and he again refused. Thereafter, Doug Adams was arrested and a search warrant was obtained for his residence.

Agent Lewis testified that he did not realize that Ron Adams was the owner of the barn until after Ron Adams had already left. Agent Lewis testified that sometime during the

22

evening, Doug Adams told him that Ron Adams was in fact the owner of the barn. It was then that Agent Joyner contacted Ron Adams and obtained consent to search the barn.

Agent Lewis described the barn as sitting on a separate lot and a separate tract of land apart from Doug Adams' residence, and that a chain link fence separated the Doug Adams' property from the barn. Agent Lewis testified that when they entered the barn, he saw a lot of renovation and recent modification, including the building of walls, to the lower level of the barn. He testified that eventually they discovered a room which, in Agent Lewis' opinion, had been used to weigh, process, and store marijuana. Agent Lewis also noticed that there was "dead space" behind one of the recently built walls. Agent Joyner then pulled back the plywood and observed the two large safes. Agent Lewis testified that he contacted Ron Adams and verified the fact that he was the owner of the barn and that he had given consent to search the barn. Ron Adams told him that he owned all the property at that location, including the house where Doug and Sheila Adams resided. Agent Lewis stated that Ron Adams told him that Doug and Sheila Adams were renting that premises from him. Agent Lewis asked Ron Adams if he had rented the barn to anyone and he said no. Ron Adams also denied placing the lock on the outside of the barn. He also stated that he was not aware that any renovations had been made to the interior of the barn, including the construction of walls.

Following this conversation, Agent Lewis stated that the agents resumed their search and tore off the paneling and found two large safes behind the wall.

Agent Lewis testified that at no time did Doug Adams or Ron Adams state that Jeremy Robbins had any possessory interest in the barn. Agent Lewis stated that he was not aware of the Lease Agreement between Ron Adams and Jeremy Robbins until September, 2005, when Ron Adams produced it during a meeting with the government.

Ron Adams also testified at the evidentiary hearing. He testified that he owns the lot and residence located on Old Liberty Hill Road in Hamblen County where Doug Adams resides, as well as the adjoining lot, Tract 12-A, which contains the barn.

Ron Adams testified that on April 19, 2005, the agents asked to search his vehicle and he consented. He testified that the agents then informed him that he had to leave. He testified that he left and was heading back toward his home in Georgia when one of the agents called and requested permission to search the barn. Ron Adams testified that he told the agent repeatedly that he would not give permission to search. He testified that the agent then asked if they could perform a walk-through. Ron Adams told the agent that if they were only going to do a walk-through, that was fine. Later, an agent called back and they asked Ron Adams if the building was leased to anybody. He recalled the agent mentioned finding two safes and some "dusting" of marijuana.

Ron Adams testified that when he returned to the barn two to three weeks later, he observed that interior walls had been knocked down, blocks had been knocked out of the exterior wall, an outer wall had been kicked in, and a door had been kicked in. He testified that he had not authorized the agents to do any of this.

Ron Adams admitted telling the agent at that time that the barn was not rented to anyone. On cross-examination, Ron Adams testified that, in his view, there is a difference between "renting" and "leasing," and therefore, he believed that he was not being untruthful with Agent Lewis when he denied that he was renting out the barn.

## II.    MOTION TO SUPPRESS EVIDENCE OBTAINED FROM SEARCH OF 1628 BROOKVIEW DRIVE

In their joint motion to suppress evidence obtained from the search of their residence at 1628 Brookview Drive [Doc. 101], Jeremy Robbins and Diane Robbins argue: (1) that the search warrant affidavit is a "bare bones" affidavit and is insufficient to establish probable cause; (2) that there is no nexus between the criminal activity alleged in the affidavit and the place to be searched, such that no reasonable officer would have believed that search was legal; (3) that the search warrant did not expressly authorize the search to be executed at night consistent with the requirements of Fed. R. Crim. P. 41(e)(2)(B); and (4) that the search was unannounced and a battering ram was used to break down the door of the residence.[1]

In its response [Doc. 183], the government argues that the state search warrant contains probable cause to authorize the search; that the search warrant authorized the early morning search of the Robbins residence; and that the officers conformed to knock and announce requirements when they made a forced entry into the defendants' home.

In their post-hearing brief, the defendants first argue that the officers failed to make a sufficient showing of probable cause to obtain a search warrant. Specifically, the defendants contend that the affidavit submitted in support of the search warrant is completely devoid of probable cause. The defendants argue that the affidavit relies almost entirely upon information obtained from Richard Todd Shrader, but that there is nothing in the affidavit to indicate Shrader's

---

[1]In the conclusion of their motion [Doc. 101], the defendants state that the search violated both the Constitution of the United States and the Tennessee Constitution. However, the exclusionary rule only requires the exclusion of evidence seized in violation of the Federal Constitution. United States v. Wright, 16 F.3d 1429, 1434 (6th Cir.), cert. denied, 512 U.S. 1243 (1994). "The fact that Tennessee law 'may . . . require greater protection against searches and seizures than the fourteenth amendment is of no avail to a defendant in federal court, under prosecution for a federal crime.'" Id. (quoting United States v. Loggins, 777 F.2d 336, 338 (6th Cir. 1985)).

reliability or his basis of knowledge, nor is there anything indicating that law enforcement corroborated any details of Shrader's information.

Second, the defendants argue that there was no nexus between the place to be searched and the items to be seized. Specifically, the defendants contend that the only nexus that the government can demonstrate between the Robbins residence and anything illegal is the government's own money, which was delivered just hours before the search by Shrader. Taking the four corners of the affidavit alone, the defendants contend, the affidavit does not support a finding that there is probable cause that actual illegal proceeds, drugs or contraband could be found at 1628 Brookview Drive.

Third, the defendants argue that the officers violated the "knock and announce" rule. The defendants contend that the forced entry into their residence at 3:00 a.m. was unreasonable because the officers failed to give proper notice to the Robbinses prior to entering the home.

Fourth, the defendants argue that the officers seized items that grossly exceeded the specific description of items to be seized in the search warrant. The defendants argue that the officers' actions undermined the particularity requirement of the Fourth Amendment, resulting in the execution of a general warrant.

Finally, the defendants argue that the good faith exception recognized in United States v. Leon, 468 U.S. 897 (1984) does not apply in this case because no reasonable officer could have relied upon this search warrant in good faith. The Court will address each of these arguments in turn.

## A.      Reliability of Informants

The defendants first contend that the search warrant affidavit does not provide sufficient probable cause in this case because it was based entirely upon information provided by an informant, Richard Todd Shrader. The defendants argue that Shrader is a person of "untested and uncorroborated value" for law enforcement purposes, and that there is nothing in the affidavit that would support the reliability, corroboration or any basis of knowledge of Shrader. Furthermore, the defendants argue that there is nothing in the affidavit to indicate that the delivery of DTF funds in fact occurred; that there is no description of what occurred when Shrader went into the house; and that there is no indication that there were any drugs involved in this transaction.

The government contends that the state search warrant contains probable cause to authorize the search of the Robbins residence. The government argues that the affidavit adequately establishes the reliability of Shrader, as he is identified by name in the affidavit. The government further contends that the affidavit informed Judge Hooper that Shrader's information was supported by corroborating information, intelligence, and surveillance supplied by the officers.

The Fourth Amendment states that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation . . . ." U.S. Const. amend. IV. Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). To make such a showing "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 244 n.13. Thus, the Supreme Court has observed that

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 U.S. 132, 162 . . . (1925), that certain items may be contraband or stolen

27

property or useful as evidence of a crime; it does not demand any
showing that such a belief be correct or more likely true than false.
A "practical, nontechnical" probability that incriminating evidence
is involved is all that is required. <u>Brinegar v. United States</u>, 338 U.S.
160, 176 . . . (1949).

<u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds

for belief supported by less than prima facie proof but more than mere suspicion." <u>United States v.</u>

<u>Bennett</u>, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists

is evaluated by looking at the totality of the circumstances. <u>Gates</u>, 462 U.S. at 238.

Initially, the Court would note that the issuing judge's determination that probable

cause exists is entitled to "great deference." <u>United States v. Allen</u>, 211 F.3d 970, 973 (6th Cir.),

<u>cert. denied</u>, 531 U.S. 907 (2000) (quoting <u>Gates</u>, 462 U.S. at 236). This deferential standard

promotes the preference for the use of search warrants as opposed to warrantless searches. <u>Id.</u> In

reviewing the propriety of the search warrant, the Court considers "the evidence that the issuing

magistrate had before him only 'to ensure that [he] ha[d] a substantial basis . . . for concluding that

probable cause existed." <u>United States v. Jones</u>, 159 F.3d 969, 973 (6th Cir. 1998) (quoting <u>Gates</u>,

426 U.S. at 238-39) (alterations in original).

In determining the sufficiency of the search warrant affidavit, the Court is "concerned

only with the statements of fact contained in the affidavit." <u>United States v. Hatcher</u>, 473 F.2d 321,

323 (6th Cir. 1973); <u>see</u> <u>United States v. Frazier</u>, 423 F.3d 526, 531 (6th Cir. 2005) ("our review of

the sufficiency of the evidence supporting probable cause is limited to the information presented in

the four corners of the affidavit").[2]

---

[2]The Sixth Circuit recently held in <u>United States v. Hang Le-Thy Tran</u>, 433 F.3d 472, 482
(6th Cir. 2006), that the issuing judge may consider unrecorded sworn testimony that
supplements a duly executed affidavit in determining whether there is probable cause upon

28

In the present case, the affidavit submitted by Joyner in support of the search warrant application recites his law enforcement experience and goes on to state as follows:

> 2. On March 2, 2005 Agents from the 4th District Drug Task Force conducted undercover operation at the residence of Jake Moore. Moore resides at 1417 Buckeye Way in Dandridge, Tennessee. Agents had arranged the delivery of five pounds of marijuana through a cooperating individual. Richard T. Shrader, had unknowingly delivered five pounds of marijuana to undercover Task Force Agents. Agents confiscated 5 pounds of marijuana and $1200.00 of Confidential Task Force marked bills.
>
> 3. On March 3, 2005 Agents were given information that the 5 pounds of Marijuana was [sic] advanced to Shrader by Jeremy Daniel Robbins. Robbins resides at 1628 Brookview Drive in Jefferson County Tennessee. Shrader was to deliver $6900.00 in United States currency to Robbins on March 3, 2005.
>
> 4. Agents arranged for $6900.00 in U.S. currency to be delivered to Robbin's [sic] residence 1628 Brookview Drive in Jefferson County Tennessee. The $6900.00 in U.S. currency was Drug Task Force funds with recorded serial numbers.
>
> 5. Based on above intelligence, surveillance, experience and training, Affiant David L. Joyner believes that illegal narcotics and drug proceeds are in the residence of 1628 Brookview Drive, Jefferson County, Tennessee....

The Court notes that veracity, reliability, and basis of knowledge of an informant are all relevant to the totality of the circumstances test, but they are not rigid categories. Allen, 211 F.3d at 972-73. As the Sixth Circuit recently explained:

---

which to issue a search warrant. The government did not rely upon this authority at the suppression hearing or in its post-hearing brief. The Court notes that Hang appears contrary to the long line of cases in the Sixth Circuit that hold that the Court's review of the evidence supporting probable cause is limited to the statements of fact contained in the affidavit. See Frazier, 423 F.3d at 531; Hatcher, 473 F.2d. at 323. Therefore, the Court is reluctant to extend the holding in Hang beyond the particular facts of that case.

> [W]hile an affidavit must state facts supporting an independent
> judicial determination that the informant is reliable, those facts need
> not take any particular form. The affidavit could state police
> corroborated significant parts of the informant's story. Or the affiant
> could attest "with some detail" that the informant provided reliable
> information in the past. Or there could be other indicia of the
> informant's reliability, such as a detailed description of what the
> informant observed first-hand, or the willingness of the informant to
> reveal his or her name. As long as the issuing judge can conclude
> independently that the informant is reliable, an affidavit based on the
> informant's tip will support a finding of probable cause.

United States v. McCraven, 401 F.3d 693, 697 (6th Cir.), cert. denied, 126 S. Ct. 639 (2005)

(citations omitted).

The Court agrees with the defendants that the affidavit submitted in support of the

search warrant does not state facts that would support an independent judicial determination that the

informant Richard Todd Shrader is reliable.[3] The Court notes at the outset that there is no indication

in the affidavit that the officers corroborated the information provided by Shrader regarding Jeremy

Robbins. Furthermore, the affidavit fails to set forth with any detail that Shrader had provided

reliable information in the past, nor does it indicate that Shrader had observed any criminal

contraband firsthand at the Robbins residence. While Shrader was apparently willing to reveal his

name, the Court finds that this fact, without more, is simply not sufficient to support a finding of

probable cause in this case. The Sixth Circuit has held that where an informant, who has seen

criminal contraband in a residence in the recent past, is identified by name in the affidavit, the

affidavit provides probable cause for the warrant to issue without further corroboration of the

---

[3]The government points out in its brief that the affidavit refers to two "informants,"
Richard Todd Shrader and Jake Moore. However, the affidavit at best indicates only that
Shrader provided information; there is no indication in the affidavit that Jake Moore in fact
provided any information to the officers, much less that he was a reliable informant.
Accordingly, the Court will limit its analysis to the informant Shrader.

informant's information.  United States v. Miller, 314 F.3d 265, 270 (6th Cir.), cert. denied, 539 U.S. 908 (2003); United States v. Pelham, 801 F.2d 875, 878 (6th Cir. 1986), cert. denied, 479 U.S. 1092 (1987).  The willingness of an informant to disclose his or her identity is typically considered an indicia of reliability because the informant would be subject to prosecution for the provision of false information if such proved to be the case.  See Miller, 314 F.3d at 270 (citing Adams v. Williams, 407 U.S. 143, 146-47 (1972)).  While Shrader is identified by name in the affidavit, there is nothing in the affidavit to indicate that he had seen criminal contraband in Jeremy Robbins' residence in the recent past.  Further, the affidavit does not indicate that the sparse information provided by Shrader regarding Jeremy Robbins is supported by any further police investigation; there is no indication that the officers conducted any surveillance of Robbins or the Robbins residence or attempted to make any controlled buys there.  For these reasons, the Court concludes that the affidavit fails to establish that Shrader is a reliable informant, and it therefore fails to support a finding of probable cause.

**B.**     **Sufficient Nexus**

Next, the defendants argue that there was no nexus between the place to be searched and the items to be seized.  Specifically, the defendants argue that the affidavit is a "bare bones" affidavit and that nothing in the search warrant indicates that drugs or any other illegal contraband could actually be found at 1628 Brookview Drive.

The government contends that the affidavit submitted in support of the search warrant made a connection between the defendant Jeremy Robbins, his residence, his criminal activity, and criminal activity occurring at his residence.  Specifically, the government argues that "Supreme Court precedent is not needed to support the simple fact that contraband, drug proceeds [money

and/or personal property], tools of the drug trade – weapons and records – evidence of illegal activity, are usually stored at a person's home."

"To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'" <u>United States v. Carpenter</u>, 360 F.3d 591, 594 (6th Cir. 2004) (en banc), <u>cert. denied</u>, 543 U.S. 851 (2004). In other words, the Fourth Amendment requires a "nexus between the place to be searched and the evidence sought." <u>Id.</u> (quoting <u>United States v. Van Shutters</u>, 163 F.3d 331, 336-37 (6th Cir. 1998)). "The critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." <u>Zurcher v. Stanford Daily</u>, 436 U.S. 547, 556 (1978).

In support of their argument that the evidence seized should be suppressed, the defendants rely upon <u>United States v. Laughton</u>, 409 F.3d 744 (6th Cir. 2005). In that case, the affidavit in support of the search warrant application related that the confidential informant had made multiple drug purchases under surveillance from the defendant in the past 48 hours. <u>Id.</u> at 746. The affiant also related that he had learned during the course of the investigation that the defendant kept drugs in the crotch area of his pants and in his pants pockets and that there were "various stashes around the home." The affiant went on to state that he believed the confidential informant to be credible and reliable due to the fact that the informant had provided reliable information in the past that had been corroborated, and that the informant had "provided information that there is [sic] more controlled substances located at or in the residence or located on the person of [the defendant] due to the fact that he has observed these controlled substances." <u>Id.</u> at 747.

The Sixth Circuit concluded that the warrant "failed to make any connection between the residence to be searched and the facts of criminal activity that the officer set out in his affidavit," and further, that the affidavit "failed to indicate any connection between the defendant and the address given or between the defendant and any of the criminal activity that occurred there." Id. Accordingly, the Sixth Circuit concluded, the district court correctly ruled that the affidavit did not provide a substantial basis for concluding that there was probable cause to issue the warrant. Id. at 747-48.

Similarly, the warrant and accompanying affidavit in the present case fail to make any connection between the Robbins residence and the allegations of criminal activity set forth in the affidavit. While the affidavit states that Jeremy Robbins resides at 1628 Brookview Drive, there is nothing to indicate that any of the criminal activity described therein in fact occurred there. There is no indication in the affidavit that Jeremy Robbins sold marijuana from his residence or that marijuana or any other type of contraband could be found there. While the affidavit states that arrangements were made for the marked DTF funds to be delivered to the residence in payment of Shrader's alleged drug debt to Robbins, it is not entirely clear from the affidavit that this delivery was in fact made. The affidavit states only that agents "arranged" for the delivery to occur; it does not specifically state that this actually happened. Even if it could be reasonably inferred that such a delivery had been made, there is nothing in the affidavit to indicate that the funds were in fact accepted by anyone at the residence in payment of a drug debt. In short, there is no indication within the four corners of the affidavit that any criminal activity had occurred or that any criminal contraband could be found at 1628 Brookview Drive. Accordingly, the Court finds that the affidavit fails to establish a sufficient nexus between the criminal activity alleged and the residence to be

33

searched; therefore, the affidavit does not establish probable cause for the issuance of the search warrant of the Robbins residence.

## C. <u>Leon</u> Good Faith Exception

Having determined that the affidavit does not support a finding of probable cause to issue the warrant, the Court turns to the government's contention that the warrant was nevertheless executed in good faith reliance and thus does not require the exclusion of the evidence seized at the Robbins residence.

In <u>United States v. Leon</u>, 468 U.S. 897, 920 (1984), the Supreme Court recognized that the deterrent effect of the judicially-created exclusionary rule did not extend to situations in which an officer in objective good faith obtains a search warrant from a judge and acts within the scope of that warrant. "In the ordinary case, an officer cannot be expected to question the [judge's] probable-cause determination or his judgment that the form of a warrant is technically sufficient . . . . Penalizing the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." <u>Id.</u> at 921 (citation omitted).

The fact that a judge has issued a warrant typically will establish that the officer has conducted the search pursuant to said warrant in good faith, but the officer's reliance upon the warrant must be objectively reasonable. <u>Id.</u> at 922. In other words, the good-faith inquiry turns upon "whether a reasonably well trained officer would have known that the search was illegal despite the [judge's] authorization." <u>Id.</u> at 922 n.23. In creating this standard, the Supreme Court set out four situations in which suppression pursuant to the exclusionary rule applied despite the officer's reliance upon a judicially-issued search warrant: (1) "if the . . . judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was

false except for his reckless disregard for the truth," (2) if the issuing judge "wholly abandoned his judicial role" requiring neutral detachment and, in essence, acted as an adjunct law enforcement officer, (3) if the "warrant [was] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" and (4) if "the warrant [is] so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." Id. at 923.

In arguing that the good faith exception applies, the government relies upon United States v. Frazier, 423 F.3d 526 (6th Cir. 2005). In that case, the Sixth Circuit determined that the affidavit supporting the search warrant application contained no facts to support the reliability of the confidential informants; that the affidavit did not contain any evidence that the officers corroborated the information that the informants provided; and further, that the allegation in the affidavit that the defendant was a drug dealer, standing alone, was not sufficient to tie the alleged criminal activity to the defendant's residence. Id. at 532-33. Accordingly, the Sixth Circuit concluded that the affidavit did not support a finding of probable cause to search the defendant's residence. Id. at 533.

The Sixth Circuit, however, went on in Frazier to analyze whether the good faith exception recognized in Leon should apply. The Court first addressed its holding in Laughton, in which the Court held that "the good faith exception to the exclusionary rule does not permit consideration of information known to a police officer, but not included in the affidavit, in determining whether an objectively reasonable officer would have relied on the warrant." Laughton, 409 F.3d at 752.

The Frazier Court stated that it did "not read Laughton as prohibiting a court in *all* circumstances from considering evidence not included in the affidavit." Frazier, 423 F.3d at 534. The Court refused to limit its inquiry regarding the officer's good faith reliance to only those facts stated in the officer's affidavit "because to do so would not serve the purposes of the exclusionary rule, and specifically, would have no deterrent effect on future police misconduct." Id. at 535. The Court went on to state as follows:

> [W]e are unable to envision *any* scenario in which a rule excluding from the Leon analysis information known to the officer and revealed to the magistrate would deter police misconduct. Leon only comes into play when an officer has a warrant, albeit a defective one. Because a judge's initial probable cause determination is limited to the four corners of the affidavit, an officer has no incentive to exclude from the affidavit information that supports a finding of probable cause only to reveal this information to the magistrate by parol. If the affidavit is not sufficient to support a finding of probable cause, the officer is unlikely to get a search warrant, and if the officer does not get a search warrant, he may not rely on Leon. Any deterrent – even the exclusionary rule – is wholly unnecessary in the absence of an incentive to engage in undesirable behavior.

Id. at 535 (citations omitted). Accordingly, the Court held "that a court reviewing an officer's good faith under Leon may look beyond the four corners of the warrant affidavit to information that was known to the officer *and revealed to the issuing magistrate*." Id. at 535-36 (emphasis added).

Of the four situations where the Leon good faith exception does not apply, only two are arguably applicable in the present case. The first situation, where the issuing judge is misled by information that is false or stated with reckless disregard, is not applicable, as the defendants have not alleged that any such false or reckless statements were made. The second situation, wherein the issuing judge "wholly abandoned his judicial role" is not applicable, as the defendants have not argued that the issuing judge in the present case merely acted as a rubber stamp for law enforcement.

36

Thus, the Court need only address the other two possible situations: where the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" and where the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers could not have reasonably presumed it to be valid.

The Sixth Circuit recently addressed the application of the good faith exception in United States v. Hython, 443 F.3d 480 (6th Cir. 2006). In Hython, the affidavit submitted in support of the search warrant application stated that a reliable confidential informant had told officers that he was able to purchase crack cocaine from a female supplier in Toronto, and that this female supplier had told the informant in the past that her source of drugs was the defendant's residence in Steubenville. Id. at 482. The officers conducted surveillance and observed a controlled buy between the confidential informant and the female supplier. The officers then followed the female supplier to the defendant's residence and observed her entering and exiting the residence within two minutes. The officers then followed her back to Toronto, where she provided the confidential informant with crack cocaine. Based upon this information, the affidavit stated, the officers believed crack cocaine to be within the residence. Id. at 483.

The district court concluded that the warrant was void for staleness because neither the warrant nor the affidavit specified the date on which the alleged drug transaction took place. Id. However, the district court found that the affidavit was otherwise not so lacking in probable cause as to render official belief in its existence entirely unreasonable and therefore concluded that application of the good faith exception was warranted. Id. The Sixth Circuit disagreed, finding that the drug transaction was not dated, and that there was no indication of any ongoing investigation,

37

previous or subsequent controlled buys, or further surveillance of either the residence or the female suspect. Id. at 488. The Court noted that any of these elements would have served to establish the residence as the site of an ongoing criminal enterprise or otherwise serve to indicate when the undated controlled buy took place. Id. at 488-89. The Court concluded that because none of these elements were present, however, the affidavit was "patently insufficient" and that "[n]o well-trained officer could have reasonably relied on a warrant issued on the basis of this affidavit." Id. at 489.

In the present case, in addition to the information set forth in the affidavit, Agent Joyner testified that when he went to obtain the search warrant for Shrader's residence from Judge Hooper, he was put under oath and advised Judge Hooper of the status of the investigation and the controlled buys between Moore and Shrader. Specifically, Joyner testified that he advised Judge Hooper that Jeremy Robbins was a target of the investigation, as Shrader had identified Jeremy Robbins as his source of marijuana. Joyner also advised Judge Hooper at that time that the confidential source indicated that Steve Shipley, Diane Robbins, and Doug Adams were involved in drug trafficking as well.

When the officers went to obtain the Robbins search warrant, Agent Joyner testified that Judge Hooper again placed the agents under oath. Joyner testified that they "basically went back over everything, I mean, that we'd already talked about . . . and then what we'd just done at the Robbins residence." Specifically, Joyner testified that he told Judge Hooper that they had sent Shrader into the Robbins residence with marked currency and that Shrader had placed the money on the kitchen counter as instructed by Diane Robbins. Joyner testified that they related to Judge Hooper what they had heard on the monitor about the money being delivered and Shrader requesting marijuana. Joyner also testified that they told Judge Hooper that Jake Moore was the cooperating

38

individual referenced in Joyner's affidavit. With respect to the reference in paragraph three of Joyner's affidavit that "[a]gents were given information that five pounds of marijuana was [sic] advanced to Shrader by Jeremy Daniel Robbins," Joyner testified that this information came from Shrader and that Judge Hooper was made aware of that fact. Having carefully reviewed the record, it simply is not clear to the undersigned whether Joyner, or Seals, told Judge Hooper that Shrader claimed to have purchased marijuana from Jeremy Robbins at the Robbins residence, 1628 Brookview Drive.

In the present case, the officers did not conduct any controlled buys with Jeremy Robbins. The only surveillance of the Robbins residence consisted of (1) the officers driving by the residence with the confidential source and the confidential source indicating that it was the residence of Jeremy Robbins and (2) the delivery of the DTF controlled funds to the residence. The controlled delivery simply consisted of Shrader taking funds to the residence and leaving them on the kitchen counter as instructed by Diane Robbins. When Shrader asked about purchasing more marijuana, Diane Robbins' only response was that Shrader needed to talk to Jeremy Robbins about that. Such surveillance does not establish that an ongoing criminal enterprise was being conducted at the residence.

Additionally, there was no surveillance conducted of the residence, prior or subsequent to the controlled delivery by Shrader, to determine whether criminal activity was taking place there. While the confidential source had indicated that Robbins was dealing marijuana out of his home, there is no indication in the record of a time frame for this activity, and thus, the Court has no basis to determine whether this information was recently obtained or whether it was stale. Similarly, although the confidential source had claimed to have seen marijuana in the residence,

there are no details provided with respect to the confidential source's firsthand observations, nor is there any indication of the time frame when these observations were made. On the other hand, Shrader did tell officers that he had been buying marijuana from Jeremy Robbins for a period of six to eight months, and that he had made the purchases in Jeremy Robbins' residence. Furthermore, although the officers did not conduct a controlled buy from Jeremy Robbins at his residence to corroborate the information provided by Shrader, Diane Robbins, in response to Shrader's request made in the Robbins' residence to purchase more marijuana from Jeremy Robbins, did tell Shrader that he would have to talk to her husband.

For these reasons, the Court finds that while the warrant is facially deficient and lacking in probable cause, it cannot be concluded that no well-trained officer would have reasonably relied upon it. Accordingly, although the defendants have made a strong argument on the <u>Leon</u> issue, the Court **RECOMMENDS** that the defendants' suppression motion [Doc. 101] be denied.

### D. Knock and Announce

Next, Jeremy Robbins and Diane Robbins argue that the DTF entry into their home was unreasonable and in violation of the Fourth Amendment because the DTF failed to properly notice the Robbinses prior to entering their home. The defendants contend that while it would appear at first blush that the officers complied with the knock and announce rule, an examination of the facts and circumstances in this case indicates that the rule was violated because: (1) the agents waited until the middle of the night to execute the warrant; (2) the officers knew that both Jeremy and Diane Robbins were in the house, and they believed them to be asleep; and (3) there were no lights or noise to indicate any activity in the house. The defendants argue that this latter point is significant because even after the police announced their presence, there was not any activity in the

40

house and the officers believed that the occupants were still asleep. This, the defendants argue, proves that the officers simply went through the motions of a proper knock and announce, but that it was a "mere formality for a no-knock warrant without prior authorization."

The government contends that the DTF followed their standard procedure for execution of search warrants in this case, and that they conformed to knock and announce requirements. Specifically, the government argues that when the agents reached the door of the Robbins residence, they announced themselves as police, paused for as much as one minute, did not receive a response, and then proceeded to force entry.

The principle that officers must identify themselves and their purpose (i.e., knock and announce) developed at common law. See United States v. Smith, 386 F.3d 753, 758 n.6 (6th Cir. 2004). The Supreme Court has held that this principle is part of the inquiry regarding whether a search is reasonable under the Fourth Amendment. Wilson v. Arkansas, 514 U.S. 927, 929 (1995); see also United States v. Finch, 998 F.2d 349, 353 (6th Cir. 1993) (holding that the knock and announce rule applies without regard to whether the warrant is executed by state or federal officers). "At its core, the 'knock and announce' rule serves to respect the sanctity of a person's home by affording notice to those inside so that they may open the door peaceably and without the needless destruction of property, as well as by avoiding the possibility of a violent confrontation if those inside mistook the police for intruders. United States v. Spikes, 158 F.3d 913, 925 (6th Cir. 1998), cert. denied, 525 U.S. 1086 (1999).

Fulfillment of the knock and announce rule is triggered not by the officer's use of any particular word but "when those inside should have been alerted that the police wanted entry to execute a warrant." Id. at 925 (observing that the occupants should have been alerted to the officers'

41

presence and purpose by the officers' announcement of same on a bullhorn 15-30 seconds before entry rather than their knock four seconds before entry). Once the officer knocks, he or she must wait a reasonable length of time before forcing entry in order to allow the occupant an opportunity to admit the officer. United States v. Dice, 200 F.3d 978, 983 (6th Cir. 2000). The Sixth Circuit has rejected establishing a bright line rule for how long officers must wait after knocking before they force entry. Spikes, 158 F.3d at 926. Whether an officer has waited long enough is determined by considering the surrounding circumstances on a case-by-case basis. Id. (holding that officers searching for drugs were justified in forcing entry 15-30 seconds after announcing in situation where they knew the occupants were armed). The Sixth Circuit has held that when officers execute a warrant in the middle of the night or otherwise have reason to believe that a prompt response from persons inside the residence is unlikely, "the length of time the officers should wait increases." United States v. Pinson, 321 F.3d 558, 567 (6th Cir. 2003).

In arguing that the officers acted unreasonably, the defendants cite United States v. Gallegos, 314 F.3d 456 (10th Cir. 2002) and Griffin v. United States, 618 A.2d 114 (D.C. App. 1992). In Gallegos, the agent in charge testified that he saw no lights on in the house and that it was dark outside. Gallegos, 314 F.3d at 457-58. At approximately 4:00 a.m., one of the officers began knocking loudly on the front door as the agent in charge yelled, "police, FBI, search warrant." Id. at 458. After the agents waited five to ten seconds, the team began to attempt to breach the door with a battering ram. Id. The Gallegos Court held that "under the circumstances known to the officers here – the time of day that the warrant was executed, the absences of any indication of any activity within the house, and the known upstairs location of the bedroom – no objectively reasonable officer would believe that Mr. Gallegos refused remittance within five to ten seconds."

42

Id. at 460. Specifically, the Court noted that "[n]o objectively reasonable officer would expect most individuals to arise, get dressed, and proceed to the front door, and admit the officers in such a short time frame." Id. at 461.

In Griffin, law enforcement officers went to the defendant's residence at 1:40 a.m. They went to the front door of the house and said, "police, I have a search warrant, open up." After ten seconds and no response, the officers knocked and identified themselves again. Additional time passed, without any response. Griffin, 618 A.2d at 115-16. The officers did not observe any light on in the apartment and heard no television or radio playing or any other sound. Id. at 116 n.2. The officers did note that there was some kind of covering over some of the windows that might have shielded light from coming in. Id. After waiting approximately thirty seconds, the officers breached the door. Id. at 115. The Griffin Court held that the thirty second time period was not reasonable. Specifically, the Court took judicial notice that "at that time of night, most people are in bed, and many are asleep. If a person is awakened by banging on the door, an immediate and appropriate response may not be feasible." Id. at 121.

The Court finds the rationale of Gallegos and Griffin to be persuasive in the instant case. Like those cases, the warrant in the present case was executed in the middle of the night. The evidence presented at the hearing indicates that there were no signs of activity from within the house; there were no lights on, and there were not any sounds coming from the residence. There was nothing, in other words, to indicate to the officers that the occupants were doing anything but sleeping when the officers knocked and announced their presence at the door.

The Court notes that the government has not cited any cases in which a delay of one minute for a search executed in the middle of the night was deemed to be sufficient. In United States

43

v. Leichtnam, 948 F.2d 370 (7th Cir. 1991), the Seventh Circuit upheld the use of a battering ram to break down a door at 6:00 a.m. after the police waited approximately a minute and a half. However, the police had knocked and announced their presence, waited thirty seconds, and then spent the additional minute making a "racket" attempting to pry open the screen door. Id. at 374. Under these circumstances, the Seventh Circuit found that a period of a minute and a half to be reasonable. In United States v. Woodring, 444 F.2d 749 (9th Cir. 1971), the Ninth Circuit upheld the execution of a search warrant where the officers waited approximately one minute before breaking in; however, in that case, the warrant was executed in the daytime or the early evening. Id. at 751.

The Court finds that the officers' waiting of only approximately one minute was not reasonable under the circumstances of this case. The Court cannot say that a reasonable officer would expect a person to wake up, realize what is happening, get out of bed, get dressed, and answer the door in less than a minute at 3:30 a.m. A violation of the knock-and-announce rule, however, does not warrant suppression of evidence obtained from the entry into the residence. See Hudson v. Michigan, ___ S. Ct. ___, 2006 WL 1640577 (June 15, 2006) (holding that "[r]esort to the massive remedy of suppressing evidence of guilt is unjustified" in case of knock-and-announce violation). Accordingly, the agents' failure to properly knock and announce in this case does not serve as a basis to suppress the evidence obtained from the search.

### E. Execution at Night

The Court next addresses the defendants' argument that there was no authority to execute this search warrant at night. In support of this argument, the defendants cite Rule 41 of the Federal Rules of Criminal Procedure. However, there is no evidence of federal participation in the

44

obtaining or execution of this search warrant. "[B]y its terms Rule 41 does not apply in a case where no federal officers are involved." United States v. Shields, 978 F.2d 943, 946 (6th Cir. 1992); United States v. Bennett, 170 F.3d 632, 635 (6th Cir. 1991). The evidence presented at the suppression hearing was that the officers who obtained and executed the search warrant were members of the Fourth Judicial Drug Task Force and therefore, state officers. Accordingly, Rule 41 is not applicable in this case.

In the event that this finding is overturned by a higher court, the Court further finds in the alternative that application of Rule 41 does not avail the defendants any relief. "[V]iolations of Rule 41 alone should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." United States v. Searp, 586 F.2d 1117, 1125 (6th Cir. 1978), cert. denied, 440 U.S. 921 (1979) (quoting United States v. Burke, 517 F.2d 377, 386-87 (2d Cir. 1975)). The Court does not find that there is any evidence of intentional and deliberate disregard for the provisions of Rule 41. The Rule specifically requires that the warrant direct the officer that it be executed during the daytime, "unless the judge for good cause expressly authorizes execution at another time." Fed. R. Crim. P. 41(e)(2)(B). "Daytime" is defined as "the hours between 6:00 a.m. and 10:00 p.m. according to local time." Fed. R. Crim. P. 41(a)(2)(B). Here, the warrant directs the officer to "make *immediate* search of the aforesaid person and residence . . . ." (emphasis added). The warrant was signed at 12:30 a.m. As the issuing judge expressly authorized an "immediate" search and signed the warrant at 12:30 a.m., the Court finds that the warrant "expressly authorizes execution" at night. Accordingly, Rule 41 was not violated in this case, and even if there were a technical violation of

45

the Rule, the defendants have not demonstrated any intentional disregard or any prejudice resulting from the officers' actions.

### F. Items Seized

Finally, the defendants argue that DTF agents seized items that grossly exceeded the specific description of items to be seized in the search warrant.[4] The defendants contend that many of the items seized – including a cigarette pack, tote bag, currency, electronics, vehicles, a safe, a briefcase, and a currency counter – are not listed in the warrant, and that it is not apparent from the nature of the items seized that they were contraband or proceeds from drug sales. Additionally, the defendants point out, there were many items in the house that were not seized, thus demonstrating that the officers exercised their own discretion in deciding which items the officers considered drug proceeds. The defendants contend that there was no indication that the items at issue were drug proceeds, and in fact, the officers had no realistic basis to know whether the items were purchased by the Robbinses before or after Jeremy Robbins allegedly became involved in the distribution of marijuana. Citing United States v. Medlin, 842 F.2d 1194, 1199 (10th Cir. 1988) and United States v. Foster, 100 F.3d 846 (10th Cir. 1996), the defendants argue that because the officers grossly exceeded the specific description of items to be seized, all evidence seized under the warrant should be suppressed.

The government argues that the Robbins search warrant and affidavit authorized with particularity the items to be seized. The government goes on to argue that the evidence shows that

---

[4]During defense counsel's cross-examination of Agent Joyner, the government objected to the cross-examination on the grounds that the issue of whether items outside of the scope of the warrant were seized was not raised in the pleadings. While the Court initially sustained the government's objection, as the parties have both addressed the issue in their post-hearing briefs, the Court will nevertheless consider it.

46

the principal source of income for the Robbinses was drug trafficking, and therefore items that were purchased with this income were properly seized as "drug proceeds."[5]

The Fourth Amendment requires that search warrants describe the items to be searched for and seized with particularity so as to "eliminate[] the danger of unlimited discretion in the executing officer's determination of what is subject to seizure." U.S. Const. amend. IV; United States v. Greene 250 F.3d 471, 476-77 (6th Cir. 2001) (citing United States v. Blakeney, 942 F.2d 1001, 1026 (6th Cir. 1991)). "While a 'general order to explore and rummage' is not permitted, the degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." Greene, 150 F.3d at 477 (quoting United States v. Ables, 167 F.3d 1021, 1033 (6th Cir. 1999)) (citation omitted). Thus, a description will be "valid if it is as specific as the circumstances and the nature of the activity under investigation permit." Id.

The defendants argue that because the officers grossly exceeded the specific description of items to be seized, *all* evidence seized under the warrant should be suppressed. However, the Sixth Circuit has explicitly held that infirmity due to overbreadth does not doom the entire warrant; rather, it "requires the suppression of evidence seized pursuant to that part of the warrant . . . , but does not require the suppression of anything described in the valid portions of the warrant (or lawfully seized – on plain view grounds, for example – during their execution)."

---

[5]In support of its argument, the government has submitted tax return information pertaining to Jeremy and Diane Robbins. The Court does not find that the defendants' tax returns are relevant to the determination of whether the warrant and affidavit satisfied the particularity requirement and whether the items seized were beyond the scope of the warrant. The Court has reviewed the tax return information submitted by the government, and notes that there is no indication in the record that this information was known to the officers and/or the issuing judge at the time the search warrant was obtained and executed. Accordingly, the Court declines to consider the tax return information in its analysis.

47

Greene, 150 F.3d at 477 (quoting United States v. Brown, 984 F.2d 1074, 1077 (10th Cir. 1993)). Thus, even if the officers exceeded the specific description of items to be seized, the Court would find that the officers' conduct would not justify suppression of all of the evidence seized.

### III. MOTION TO SUPPRESS EVIDENCE OBTAINED FROM THE SEARCH OF 8116 HULLS MILL ROAD

Defendants Jeremy Robbins and Diane Robbins move the Court to suppress all evidence obtained as a result of the warrantless search of Steve Shipley's residence located at 8116 Hulls Mill Road on March 4, 2005. [Doc. 130]. For grounds, the defendants argue that through the execution of the illegal search of 1628 Brookview Drive, the officers obtained information that they might find evidence of crimes at 8116 Hulls Mill Road. The defendants further argue that the search of Shipley's residence was performed without a search warrant, was not based upon any valid exception to the warrant requirement, and therefore was in violation of the defendants' constitutional rights.

The government opposes the defendants' motion, arguing that Jeremy Robbins and Diane Robbins lack standing to challenge the search of Shipley's residence located at 8116 Hulls Mill Road. [Doc. 183].

In order to have standing to contest whether a search comports with the Fourth Amendment, the defendant must have "a legitimate expectation of privacy" in the location searched. Rakas v. Illinois, 439 U.S. 128, 143 (1978). "It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001). A finding of a reasonable expectation of privacy does not turn solely upon

48

the defendant's subjective belief but also depends upon (1) the defendant's interest in and control of the place searched; (2) any measures the defendant took to ensure privacy; and (3) whether society recognizes the defendant's expectation as reasonable. United States v. Padin, 787 F.2d 1071, 1075-76 (6th Cir.), cert. denied, 479 U.S. 823 (1986).

In the present case, the Court agrees with the government that neither Jeremy Robbins or Diane Robbins have a legitimate expectation of privacy in the residence at 8116 Hulls Mills Road. There is no evidence that either defendant had any interest in or control of the residence, nor is there any evidence to indicate that either defendant even had a subjective expectation of privacy in the residence. Accordingly, the Court finds that Jeremy Robbins and Diane Robbins lack standing to challenge the search of the Shipley residence at 8116 Hulls Mill Road.

Even if the defendants had standing to challenge the search, the Court does not find that the search of Shipley's residence constituted "fruit of the poisonous tree." First, the Court finds that the search of the Robbins residence was legal. Second, even if a reviewing court found the Robbins search to be illegal, the Court finds that the agents had an independent basis for the search of Shipley's residence. Joyner testified that while the agents were at Judge Hooper's residence obtaining the Robbins search warrant, Joyner told Judge Hooper the information the agents had obtained from the confidential source about Steve Shipley, including where he lived, the fact that he had made trips out west to pick up marijuana with Jeremy Robbins, and that more than likely his house was being used as a stash house. Joyner discussed possibly obtaining a warrant for Shipley's residence based upon this information. Joyner testified that Judge Hooper told him that based on the information that the agents had, they did not have enough to get a search warrant, but he

49

encouraged the agents to do a "knock and talk." This testimony indicates that the officers' decision

to go to the Shipley residence and conduct a "knock and talk" was not a result of the search executed

at 1628 Brookview Drive, but rather was the product of the officers' prior investigation and

conversations with their confidential informants regarding Steve Shipley's alleged involvement with

drug trafficking. "Under the independent source doctrine, evidence will be admitted if the

government can show it was discovered through sources 'wholly independent of any constitutional

violation.'" United States v. Leake, 95 F.3d 409, 412 (6th Cir. 1996) (quoting Nix v. Williams, 467

U.S. 431, 442-43 (1984)).

For the foregoing reasons, it is **RECOMMENDED** that the Joint Motion to Suppress

Evidence Obtained from the Search of 8116 Hulls Mill Road [Doc. 130] filed by Jeremy Robbins

and Diane Robbins be denied.


IV.     **MOTION TO SUPPRESS EVIDENCE OBTAINED FROM THE SEARCH OF TRACT 12-A, HAMBLEN COUNTY, TENNESSEE**

Defendant Jeremy Robbins moves to suppress all evidence obtained as a product of

a warrantless search executed on April 19, 2005 of "Tract 12-A," located in Hamblen County,

Tennessee. [Doc. 210]. For grounds, Jeremy Robbins argues that he leased this property and barn

from Ron Adams, and that he never gave his consent to search the property or the barn at anytime.

Defendant further argues that even assuming that the government could show that the agents could

somehow rely on their communication with Ron Adams for authority to enter the property, the

agents exceeded the scope of that limited authority and, as a direct result of this more extensive

search, illegally recovered and seized evidence.

50

The government argues that Defendant Jeremy Robbins has abandoned the property. Specifically, the government contends that because Robbins made no claim to this premises prior to notification by the government that it had obtained a copy of the Lease with Purchase Option agreement, Robbins has no standing to challenge the search. Alternatively, the government argues that the officers reasonably relied on Ron Adams' claims of ownership and his statement that he had not rented the barn to anyone, and that Ron Adams gave the agents full consent to search without conditions or limitations.

The Fourth Amendment generally prohibits warrantless searches of property. See Payton v. New York, 445 U.S. 573 (1980); Johnson v. United States, 333 U.S. 10 (1948). "The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (citations omitted). In Rodriguez, the Supreme Court held that a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not. Id. at 188. The Court further held that the reasonableness of the officers' decision to search based upon the consent of a third party must be determined by the objective standard of whether the facts available at the moment would warrant a person of reasonable caution in the belief that the consenting party had authority over the premises. Id.; United States v. Hall, 979 F.2d 77, 79 (6th Cir. 1992), cert. denied, 507 U.S. 947 (1993).

In the present case, the facts available at the time that the agents searched the barn located on Tract 12-A would have warranted a person of reasonable caution in the belief that Ron Adams had authority over the premises. Further, the facts available at the time of the search would

51

not have led a reasonable person to believe that Jeremy Robbins had any lawful interest in the premises. Doug Adams advised the officers that the tract and barn adjoining his residence was owned by his uncle, Ron Adams. When agents contacted Ron Adams by telephone, he not only confirmed this fact but affirmatively stated that he was not renting the barn to anyone. When questioned about the lock on the barn, Ron Adams stated that he was not aware of any lock being placed there. However, the agents were also aware that Doug Adams had access to the barn (although he claimed not to use it), and that he had the key to the padlock. Thus, the fact that a lock was on the barn would not have indicated to the officers that Jeremy Robbins or any third party for that matter was leasing the premises.

Ron Adams claims that he was not untruthful in telling agents that the barn was not rented, because in his mind, there is a difference between the "renting" and "leasing" of property. However, he did not explain this distinction to the agents and in no way attempted to convey to them that Jeremy Robbins in fact was leasing the barn. Based upon these facts, the Court finds that a reasonable person would have believed that it was Ron Adams, not Jeremy Robbins, who had authority over the premises. Accordingly, the Court finds that the officers' belief that Ron Adams had authority to give consent to search the barn was reasonable.

Jeremy Robbins argues that even if the officers reasonably relied upon Ron Adams' claim of ownership, the evidence obtained from the search should nevertheless be suppressed because the officers exceeded the scope of authority granted by Ron Adams. Assuming *arguendo* that Jeremy Robbins has standing to challenge the scope of the search consented to by Ron Adams, the Court finds that the scope of the search was permissible.

"A consensual search is confined to the terms of its authorization." United States v. Strickland, 902 F.2d 937, 941 (6th Cir. 1990). "The scope of the actual consent restricts the permissible boundaries of a search in the same manner as the specifications in a warrant." Id.

On this point, there is conflicting testimony. Agent Joyner testified that Ron Adams gave the agents permission to search the barn for contraband. Joyner denied that Ron Adams ever revoked his consent. Agent Lewis testified that after their initial search of the barn, but before they completely removed the wood paneling, he contacted Ron Adams and verified the fact that he was the owner of the barn and that he had given consent to search the barn. Ron Adams testified, on the other hand, that when he was initially contacted by the agents, he repeatedly told them that he would not give permission to search. He testified that he agreed to the agents only doing a walk-through of the barn. He further testified that he did not give agents authorization to knock down any walls or kick in any doors.

The Court credits the testimony of the agents on this issue and finds that Ron Adams authorized the agents to search the barn for contraband, not just to perform a walk-through of the barn. Even if the agents had just been entitled to perform a walk-through, however, the Court finds that the scope of the search was permissible. When the agents first entered the barn, they observed a recently constructed wood paneled wall, which based upon their experience and training, they found suspicious. Specifically, the agents believed that, given the type of materials used and the placement of the wall, the wall was likely a false wall. Based upon this information, the agents were justified in peeling back the wood paneling and, upon seeing the large safes, in removing the paneling entirely. While an officer cannot reasonably interpret a general statement of consent to search to include the intentional infliction of damage, a search may include some damage to property

53

"if the damage is reasonably necessary to gain access to a specific location where the officers have probable cause to believe that the object of their search is located." Strickland, 902 F.2d at 941-42. Even though Ron Adams did not authorize the destruction of any walls, the information gathered by the officers during the initial, consensual phase of the search provided the probable cause necessary to extend the search beyond the scope of Ron Adams' consent. See id. (information gathered during consensual search of vehicle provided probable cause to slash open spare tire found in trunk).

For these reasons, the Court concludes that the agents reasonably relied upon Ron Adams' claim of authority to search the barn located on Tract 12-A. The Court further finds that the scope of the search was permissible. Accordingly, it is **RECOMMENDED** that Jeremy Robbins' motion [Doc. 210] to suppress the evidence seized from this search be denied.

## V.  DEFENDANT DIANE ROBBINS' MOTION TO SUPPRESS STATEMENTS

Defendant Diane Robbins moves to suppress all statements that she allegedly made on March 4, 2005 to members of the DTF during the search of her home. [Doc. 92]. Defendant Jeremy Robbins joins in this motion. [Doc. 175]. For grounds, Diane Robbins argues that any statements that she made were the byproduct of police coercion and/or intimidation, and under the totality of circumstances then existing, were not voluntarily given.

The government opposes this motion, arguing that Diane Robbins voluntarily agreed to and executed a DTF admonition and waiver of rights form, and that she cannot show that law enforcement officers acted by way of coercion, trickery or deceit to elicit statements from her. [Doc. 184].

54

In order to protect his or her Fifth Amendment right to be free of compelled self-incrimination, a person enjoys the right to have counsel present during custodial interrogation. Miranda v. Arizona, 384 U.S. 486, 474 (1966). Once an individual invokes his or her right to counsel under Miranda, law enforcement may not continue to question him or her or subsequently approach the individual for questioning until the individual has counsel available. Edwards v. Arizona, 451 U.S. 477, 484 (1981).

Before it may introduce an incriminating statement by a defendant, the government must prove that the defendant voluntarily, knowingly, and intelligently waived his or her Miranda rights. Colorado v. Connelly, 479 U.S. 157, 169-70 (1986). The government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence. Id. at 168. To determine whether a confession was voluntary, the court must examine the following factors in light of the totality of the circumstances: (1) whether the police conduct was objectively coercive; (2) whether the coercive police conduct was sufficient to overbear the defendant's will when viewed subjectively from the defendant's state of mind; and (3) whether the coercive police conduct was in fact the cause of the defendant's will being overborne. McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988), cert. denied, 490 U.S. 1020 (1989). Coercive police activity is a necessary predicate to a finding that a confession is not voluntary. Id. at 459. "If the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed." Id. (citing Connelly, 479 U.S. at 164).

In the present case, when the officers entered the residence at approximately 3:30 a.m., they found Diane Robbins in bed in the master bedroom. She was told to get out of bed, was immediately handcuffed, and was placed in her son's bedroom with Agent Seals. Diane Robbins

55

was advised of her <u>Miranda</u> rights by Agent Seals.  Seals testified that he read a <u>Miranda</u> rights waiver form to Diane Robbins, and that she indicated that she understood.  She signed the rights waiver, and Seals and Joyner both signed as witnesses.  Seals noted the time of signature on the form as 3:41 a.m.  After Diane Robbins signed the rights waiver, Seals asked her a few questions, such as whether she knew of any drugs in the house, and if she knew of Jeremy Robbins ever going out west.  Seals testified that she was not handcuffed at this time, and that she eventually fell asleep.  Seals testified that Diane Robbins never requested to speak with an attorney at any time, and that no other officers questioned her during the search.

To assess whether a confession was voluntary, the Court must "examine 'the totality of the circumstances surrounding the confession, both the characteristics of the accused and the details of the interrogation, and determine[] their psychological impact on an accused's ability to resist pressures to confess.'"  <u>United States v. Rigsby</u>, 943 F.2d 631, 635 (6th Cir. 1991), <u>cert. denied</u>, 503 U.S. 908 (1992) (quoting <u>United States v. Brown</u>, 557 F.2d 541, 546 (6th Cir. 1977)).  In the present case, the Court finds that the conduct of the law enforcement officers was not objectively coercive.  Although Diane Robbins was in police custody when questioned, there is no evidence that her environment was oppressive or coercive.  Moreover, while there were numerous officers participating in the search, the evidence shows that she was not handcuffed during her questioning; that she was questioned only by one officer; and that this questioning took place in her son's bedroom, away from the other officers and her co-defendant husband.  There is no proof that the officers mistreated or abused her in any way.  Furthermore, there is no evidence to support a finding that Diane Robbins' mental state rendered her waiver of <u>Miranda</u> rights and answering of

questions involuntary. Accordingly, the Court finds that the statements made by Diane Robbins were voluntary and should not be suppressed on that basis.

Determining whether the defendant's statement was voluntarily given, however, is merely a threshold determination for the purposes of the Fourth Amendment. See Taylor v. Alabama, 457 U.S. 687, 690 (1982). "The exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth." Brown v. Illinois, 422 U.S. 590, 601 (1975).

"The exclusionary rule generally bars the admissibility at trial of tangible evidence, as well as verbal statements, acquired through unconstitutional means." United States v. Akridge, 346 F.3d 618, 623 (6th Cir. 2003), cert. denied, 540 U.S. 1203 (2004) (citing Wong Sun v. United States, 371 U.S. 471, 485 (1963)). The rule not only bars the use of evidence obtained directly as a result of an illegal search or seizure, but also evidence that is "later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" Segura v. United States, 468 U.S. 796, 804 (1984) (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)). Evidence is not to be excluded, however, "if the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint." Segura, 468 U.S. at 804 (quoting Nardone, 308 U.S. at 341). "Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation." United States v. Smith, 386 F.3d 753, 763 (6th Cir. 2004) (quoting United States v. Miller, 146 F.3d 274, 280 (5th Cir. 1998)).

In order to break the causal chain between an unlawful search and seizure and statements made subsequent thereto, the statements must not only meet the voluntariness standard under the Fifth Amendment but also must be "sufficiently an act of free will to purge the primary taint." Brown, 422 U.S. at 602 (quoting Wong Sun, 371 U.S. at 486). As the Supreme Court explained in Brown:

> It is entirely possible, of course, . . . that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the Miranda warnings, alone and per se, cannot make the act sufficiently a product of free will [to] break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited.

Brown, 422 U.S. at 603. While Miranda warnings are an important factor in determining whether a confession is obtained by exploitation of an illegal arrest, the court should also consider the proximity of time between the arrest and the confession; any intervening circumstances; and the purpose and flagrancy of the official misconduct. Id. at 603-604. The burden of showing that the statements are admissible rests with the government. Id. at 604.

The evidence indicates that the officers entered the Robbins residence at approximately 3:30 a.m. Diane Robbins' waiver form was signed at approximately 3:41 a.m. The Court has found, supra, that the entry was legal. If a reviewing court finds that the entry was illegal, however, the Court would find, in the alternative, that the taint of an illegal entry of the Robbins residence did not dissipate in the approximately eleven minutes that passed between the time of the entry and the waiver of her Miranda rights. Moreover, the government has not offered any evidence of any intervening circumstance that would have broken the causal chain between an illegal entry and Diane Robbins' waiver of rights and subsequent statements. See United States v. Richardson,

949 F.2d 851, 859 (6th Cir. 1991) (holding twenty minutes to be insufficient); United States v. Gamez, 389 F. Supp. 2d 975, 982 (S.D. Ohio 2005) (finding taint of illegal entry had not yet dissipated in a one hour and approximately thirty minute time span). Therefore, in the event that a reviewing court finds that the search was not legal, the statements should be suppressed. However, as the Court finds that the search was legal, it is **RECOMMENDED** that Diane Robbins' Motion to Suppress Statements [Doc. 92] be denied.

## VI.    DEFENDANT JEREMY ROBBINS' MOTION TO SUPPRESS STATEMENTS

Defendant Jeremy Robbins also moves to suppress statements that he made to DEA agents on March 4, 2005 following the search of his residence. [Doc. 115]. For grounds, Jeremy Robbins argues that his statements were elicited by coercion, threats, promises of leniency, and/or misrepresentations by law enforcement officers such that it overbore his will. Specifically, Robbins claims that his statement to DEA Agent Lewis was made only after Robbins had received assurances that his statements would not be used against him and that he would receive Kastigar protection during the course of the interview.

The government argues that Jeremy Robbins voluntarily agreed to and executed two admonition and waiver of rights forms, one executed at the time of the search of his residence and another at the DEA office. The government further contends that Robbins' statements were voluntarily made, without coercion, and that Robbins cannot show that law enforcement officers acted by way of coercion, trickery, or deceit to elicit statements from him. The government further denies that Jeremy Robbins was extended any Kastigar protection during his interview with Agent Lewis on March 4, 2005. [Docs. 183, 268].

59

Agent Lewis testified that Robbins was brought into a conference room at the DEA office where Agent Lewis and Agent James Blanton interviewed him. Agent Lewis testified that Pretrial Services was not present when Robbins arrived at the DEA office. He testified that any interview of Mr. Robbins by Pretrial Services would have occurred after his interview. Prior to asking Robbins any questions, Agent Lewis testified that he introduced himself and Agent Blanton to Robbins; told Robbins where he was and why he was there; and told him what he was going to be charged with and the possible penalties he would be facing as a result of those charges. Lewis further testified that he told Robbins that he was going to advise him of his rights, and that Robbins stated that he had already been advised of his rights. Lewis testified that at that point, Robbins "blurted out" that the marijuana stored at the Shipley residence was his and that Shipley was only storing it for him. Lewis then advised Robbins of his constitutional rights and had him sign a rights waiver form. This rights waiver form was introduced into evidence [Ex. 3]. The form had been signed by Robbins and witnessed by Agents Blanton and Lewis at 1:52 p.m. Lewis testified that he read the waiver form to Mr. Robbins and asked him line-by-line whether he understood his rights. Lewis testified that Robbins indicated that he understood his rights. Lewis testified that Robbins did not indicate at anytime that he wanted to speak with a lawyer. In fact, Lewis testified that Robbins indicated to him from the beginning of the interview that he had a willingness to talk, and that Agent Lewis had to intentionally slow down the proceedings to ensure that Robbins understood what he was doing. Lewis testified that no negotiations occurred during the reading of the rights waiver. When Agent Lewis asked Robbins to identify the people he would sell marijuana to, Robbins said that he was not sure that he wanted to do that and asked for time to think about that for a little while. At this point, Agent Lewis terminated the interview.

Jeremy Robbins' account of this interview is markedly different from the account given by Agent Lewis. Jeremy Robbins testified that when he was brought to the DEA office on March 4, 2005, he was initially placed in a holding cell for a few hours. He testified that the Pretrial Services Officer, Twilla Tucker, showed up and took him into a room and began filling out paperwork on him to see if he could have a lawyer appointed. He advised Ms. Tucker that he wanted a lawyer but that he could not afford one. Robbins testified that during this interview, Agent Lewis came in and told Ms. Tucker that he was going to interview Robbins first and that Ms. Tucker could go ahead and take care of Mr. Shipley's paperwork. Robbins testified that he went into a conference room with Agent Lewis. He testified that they were alone in the room, except for Agent Davis coming in and out. Robbins testified that Agent Lewis read him his rights and asked him if he understood it after each sentence.

Robbins testified that after they were done reading the rights waiver, and he signed and dated it, he asked Agent Lewis when he would be able to speak to his lawyer. Robbins testified that Agent Lewis stated that Pretrial Services was working on getting his paperwork done and that Robbins would be able to see a lawyer at his initial appearance. Robbins testified that Agent Lewis told him that having a lawyer present "pretty much gets in the way, that a deal, if a deal could be worked, that it would be a lot easier done if it was just me and him." Robbins testified that Agent Lewis told him that he hoped Robbins would cooperate, and that if Robbins agreed to cooperate, the government would offer him Kastigar protection. Robbins testified that Agent Lewis explained that Kastigar protection meant that if Robbins offered to share information with the government, nothing he said could be used against him, and that Robbins would be provided "the full protection" of the government. Robbins testified that Agent Lewis said that if Robbins cooperated, he could receive

61

as much as a 50 percent sentence reduction, although such a reduction was very rare. Robbins testified that Agent Lewis stressed that he himself could not decide on that reduction, but that he could make a recommendation to the U.S. Attorney.

Robbins testified that they waited for Agent Blanton to come in to witness the signing of the rights waiver. Robbins testified that thereafter, he shared information with Agent Lewis, but that he was hesitant, and that he agreed to talk only after he was told "repetitively" that his wife could and probably would be indicted if he did not cooperate. Robbins testified that he decided to cooperate because he did not want his wife to be indicted and because Agent Lewis had told him that what he said could not be used against him.

Agent Lewis' version of events is corroborated by Pretrial Services Officer Twilla Tucker. Ms. Tucker testified that she left her office at 1:30 p.m. and probably arrived at DEA between 1:45 and 1:50 p.m. Ms. Tucker testified that she interviewed Steve Shipley at approximately 2:30 p.m. and Jeremy Robbins at approximately 3:00. Tucker testified that Agent Lewis brought Mr. Robbins to her for the interview. She denied that Agent Lewis ever interrupted her interview with Robbins. She recalled, in fact, that before their interview began, Jeremy Robbins stated to her that he really liked Agent Lewis, that he was a "nice guy," that Agent Lewis was treating him right, and that he was "very happy with him."

Agent Lewis' version of events is further corroborated by the testimony of Agent James Blanton. Agent Blanton testified that Agent Davis asked him to step in and sit in on an interview with Robbins. When Blanton arrived, Robbins was in the room along with Special Agent Lewis. Special Agent Davis was in the doorway. Blanton walked in, and he and Lewis started the interview. Blanton testified that he was present when the Miranda warnings were read to Robbins.

62

He testified that Lewis read through each line of the waiver with Robbins and asked him after each line whether he understood his rights, and that Robbins indicated that he did. Blanton denied that any arrangement different from what was stated in the waiver form was ever discussed. Blanton testified that he was present for the entire interview, and that there was not any offer of leniency or of any type of <u>Kastigar</u> agreement made to Jeremy Robbins at any time. Blanton also did not recall anyone from Pretrial Services being at the DEA office during this interview.

   The Court credits the testimony of Agent Lewis, Agent Blanton, and Pretrial Services Officer Twilla Tucker with respect to the events surrounding Jeremy Robbins' interview. The Court therefore finds that Jeremy Robbins was not offered any leniency or any type of <u>Kastigar</u> protection during this interview. The Court further finds, crediting the testimony of Agent Lewis, that Jeremy Robbins did not invoke his right to counsel during this interview.

   Considering the totality of the circumstances, the Court finds that Jeremy Robbins' statements to Agent Lewis were voluntarily given. The evidence demonstrates that the conduct of the law enforcement officers was not objectively coercive. Although Jeremy Robbins was in custody at the time he was questioned, there is no evidence to indicate that his environment was oppressive or coercive, or that the agents mistreated or abused him in any way. Lewis testified that Robbins "blurted out" that the marijuana stored at the Shipley residence was his and that Shipley was only storing it for him prior to his <u>Miranda</u> rights being read to him. The Court finds that this statement was made voluntarily, without questioning or pressure by Agent Lewis, and therefore does not implicate <u>Miranda</u>. <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300 (1980) ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility [is not implicated by <u>Miranda</u>]."). Agent Lewis testified that he then read Jeremy Robbins his <u>Miranda</u>

63

rights and asked him after every line whether he understood those rights. Jeremy Robbins indicated that he did, and he signed the waiver form. There is no evidence to support a finding that his mental state rendered his waiver of <u>Miranda</u> rights and answering of questions involuntary.

Jeremy Robbins testified that he felt compelled to talk only after he was told that his wife could and probably would be indicted if he did not cooperate. Threats to arrest family members of the suspect may cause a confession to be involuntary, but only if the police had no basis for concluding that the family members had any knowledge or involvement in the defendant's criminal activity. <u>See</u> <u>United States v. Finch</u>, 998 F.2d 349, 356 (6th Cir. 1993) (finding confession to be involuntary when officers threatened to arrest defendant's family members whom police had no basis for concluding had any knowledge or involvement of cocaine in the house or the distribution of cocaine by the defendant). In the present case, the officers had a reasonable basis for concluding that Diane Robbins not only had knowledge of, but also involvement in, her husband's drug trafficking activity. Accordingly, the fact that the agents may have told Jeremy Robbins that his wife probably would be indicted was not coercive conduct under the circumstances and therefore did not render Jeremy Robbins' statements involuntary.

The Court further finds that Jeremy Robbins' statements to Agent Lewis in the vehicle on the way to Robbins' initial appearance were voluntarily given. On the way to the courthouse, Robbins volunteered that he had changed his mind and that he was willing to tell Agent Lewis the names of the people to whom he sold marijuana. Robbins went on to identify five people as his primary customers and gave details about their addresses, phone numbers, and the types of purchases they made. Statements that are volunteered by a defendant do not implicate <u>Miranda</u>. <u>See</u> <u>United States v. Murphy</u>, 107 F.3d 1199, 1204-05 (6th Cir. 1997) (where no questioning took

64

place, defendant's voluntary statements in police cruiser were admissible despite lack of <u>Miranda</u> warnings).

Having determined that Jeremy Robbins' statements were voluntarily made, the Court must still consider whether they should nevertheless be suppressed as "fruits of the poisonous tree," in the event that a reviewing court disagrees with this Court's finding that the search of the Robbins residence was legal. Upon consideration of all the relevant circumstances, the Court finds, in the alternative, that Jeremy Robbins' waiver of his <u>Miranda</u> rights and subsequent statements to Agent Lewis sufficiently constitute "an act of free will to purge the primary taint" of an illegal search of his residence. <u>See</u> <u>Brown</u>, 422 U.S. at 602 (quoting <u>Wong Sun</u>, 371 U.S. at 486). The evidence shows that Jeremy Robbins was advised of his <u>Miranda</u> rights at the time of the search but gave no statements to any officers at that time. When he arrived at the DEA office approximately nine to ten hours later, he was brought to Agent Lewis, who had not been involved in the entry and search of the Robbins residence, for questioning. Agent Lewis advised Jeremy Robbins of what he was going to be charged with, and made sure that Robbins understood the nature of those charges. He then read Jeremy Robbins his <u>Miranda</u> rights, Robbins signed a waiver, and he began to answer Agent Lewis' questions. These factors, considered together, demonstrate that Jeremy Robbins' waiver of his right to remain silent and his right to counsel was knowing and intelligent, and constituted an "act of free will" sufficient to break the causal chain between an illegal entry and his waiver of rights and subsequent statements. <u>See</u> <u>United States v. Daniel</u>, 932 F.2d 517, 521 (6th Cir.), <u>cert. denied</u>, 502 U.S. 890 (1991) (finding defendant's second statement was made after "clean break" from circumstances surrounding first statement; second statement was made the following

day, after the defendant had been moved to a different place, read his <u>Miranda</u> rights, and interrogated by an officer not involved in the illegal search that occurred the day before).

 For the foregoing reasons, it is **RECOMMENDED** that Defendant Jeremy Robbins' Motion to Suppress Statements [Doc. 115] be denied.


## VII. CONCLUSION

 For the foregoing reasons, it is **RECOMMENDED**[6] (1) that Defendants Jeremy Robbins' and Diane Shands Robbins' Joint Motion to Suppress Evidence Obtained from the Search of 1628 Brookview Drive [Doc. 101] be **DENIED**; (2) that Defendants Jeremy Robbins' and Diane Shands Robbins' Joint Motion to Suppress Evidence Obtained from the Search of 8116 Hulls Mill Road [Doc. 130] be **DENIED**; (3) that Defendant Jeremy Robbins' Motion to Suppress Evidence Obtained from the Search of Tract 12-A Hamblen County [Doc. 210] be **DENIED**; (4) that Defendant Diane Shands Robbins' Motion to Suppress Statements [Doc. 92] be **DENIED**; and (5) that Defendant Jeremy Robbins' Motion to Suppress Statements [Doc. 115] be **DENIED**.

 Respectfully submitted,

  s/ H. Bruce Guyton
  United States Magistrate Judge

---

[6] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); <u>see also</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide <u>de</u> <u>novo</u> review where objections to this report and recommendation are frivolous, conclusive, or general. <u>Mira v. Marshall</u>, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. <u>Smith v. Detroit Federation of Teachers</u>, 829 F.2d 1370, 1373 (6th Cir. 1987).